**Bradley MILLER, Plaintiff,**

v.

**KENWORTH OF DOTHAN, INC., Defendant.**

**No. CIV. A. 98–D–1063–S.**

United States District Court,
M.D. Alabama,
Southern Division.

Jan. 10, 2000.

---

## MEMORANDUM OPINION

DE MENT, District Judge.

Before the court is Defendant Kenworth of Dothan, Inc.'s ("Kenworth") Motion For Judgment As A Matter Of Law ("Mot.") made at the close of Plaintiff's case on November 2, 1999, and at the close of all the evidence on November 3, 1999. The court heard arguments, reserved decision and submitted the case to the jury. After the jury returned a verdict in favor of Plaintiff on his hostile work environment claim brought under 42 U.S.C. §§ 2000e *et seq.*, and 42 U.S.C. § 1981, the court ordered that the trial be transcribed to allow the Parties to brief the issues argued by Kenworth in support of its Motion. The trial transcript having been prepared, the Parties have now filed their briefs.

On December 3, 1999, Kenworth filed a Memorandum Of Law In Support Of Motion For Judgment As A Matter Of Law ("Mem."). On December 13, 1999, Plaintiff Bradley Miller ("Plaintiff") filed an Opposition To Kenworth's Memorandum, which the court construes as a Response ("Resp."). Kenworth filed a Reply on December 22, 1999. In an Order entered December 30, 1999, the court denied Kenworth's Motion. The court now explains the reasons for that denial.

## I. JURISDICTION AND VENUE

The court properly exercises subject matter jurisdiction over this action, pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, as amended ("Title VII"), and the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("§ 1981"). The Parties do not contest personal jurisdiction or venue.

## II. JUDGMENT AS A MATTER OF LAW STANDARD

Pursuant to Rule 50(a) of the *Federal Rules of Civil Procedure,* judgment as a matter of law is warranted where "a party has been fully heard on an issue and there

Banks T. Smith, Mark A. Jones, Dothan, AL, for Plaintiff.

David B. Anderson, David B. Walston, Birmingham, AL, for Defendant.

is no legally sufficient evidentiary basis for a reasonable jury to find for that party." FED.R.CIV.P. 50(a). On a motion for judgment as a matter of law, the court construes the evidence and factual inferences in the light most favorable to the nonmoving party. *Mendoza v. Borden, Inc.,* 195 F.3d 1238, 1244 (11th Cir.1999). As explained in *Mendoza,*

> Although the existence of a genuine issue of material fact precludes judgment as a matter of law, "a jury question does not exist because of the presence of a 'mere scintilla of evidence'." A motion for judgment as a matter of law will be denied only if "reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions." These standards require [the court] to consider "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." "If the facts and inferences point overwhelmingly in favor of one party, such that reasonable people could not arrive at a contrary verdict, then the motion was properly granted."

*Id.* (internal citations omitted).

## III. PROCEDURAL HISTORY

On September 21, 1998, Plaintiff filed this employment discrimination lawsuit against Kenworth. The Complaint contains two counts. First, Plaintiff alleges that he was subjected to harassment on the basis of his race, which resulted in a hostile work environment ("hostile work environment claim"). Second, Plaintiff asserts that he was terminated in retaliation for threatening to sue Kenworth for race discrimination ("retaliation claim"). Plaintiff brings his dual claims under both Title VII and § 1981. (Compl. at 1–2.)

The trial of this case commenced on November 1, 1999. At the close of Plaintiff's evidence, Kenworth orally moved for judgment as a matter of law on both counts. (Tr. at 377–385, 388–393, 394–395,

1. The court will refer to the trial transcript as

407.)[1] The court reserved ruling, stating that it would "take" the Motion "under advisement." (Tr. at 402–404.) At the close of all the evidence, Kenworth again moved for judgment as a matter of law. (Tr. at 495–98.) The court continued to reserve ruling and submitted the case to the jury subject to the court later deciding the legal questions raised by the Motion. (Tr. at 498, 504.) On November 3, 1999, the jury returned a verdict in favor of Plaintiff on his hostile work environment claim and in favor of Kenworth on Plaintiff's retaliation claim. The jury awarded $25,000 in compensatory damages and $50,000 in punitive damages. (Tr. at 588.)

## IV. FACTUAL BACKGROUND

### A. The Evidence Adduced At Trial

Viewed in the light most favorable to Plaintiff, the facts developed at trial pertaining to Plaintiff's hostile work environment claim are as follows. Plaintiff, who is Mexican–American, was employed by Kenworth, a tractor-trailer dealership with offices in Dothan and Birmingham. Plaintiff worked in Kenworth's Dothan office from September 1997 until he was fired on December 22, 1997. During Plaintiff's employment, he worked in the Parts Department at the Back Parts Counter. In this position, Plaintiff distributed parts to the Service Technicians (i.e., mechanics) in Kenworth's Service Department. (Tr. at 32, 37, 51, 56, 58, 62, 226–227, 234, 247, 251, 291–293.)

Kenworth's Dothan office consisted of less than 50 employees, while the Birmingham office was larger with between 50 and 100 employees. (Tr. at 212–213.) During Plaintiff's employment, the management hierarchy at Kenworth was as follows:

Robert L. Mitchell

President

| Jeff Weaver | Andy Thurmond |
|---|---|
| Director of Parts and Service | Director of Operations |

| Tommy Davenport | David Brooks | Laura Box |
|---|---|---|
| Parts Manager | Service Manager | Sales Manager |

"Tr." .

(Tr. at 56, 59, 86–88, 136–137, 195–196, 234, 244, 246, 289–290, 460–61, 467.)

Kenworth maintained separate departments for its Parts and Service operations. The Parts Department consisted of the Warehouse, the Front Parts Counter and the Back Parts Counter where Plaintiff worked. Tommy Davenport ("Mr. Davenport") was the manager of the Parts Department and was Plaintiff's immediate supervisor. (Tr. at 61–62, 86–88, 289–290, 460–461.) David Brooks ("Mr. Brooks") was the manager of the Service Department. He supervised approximately eight Service Technicians and the Shop Foreman, who was Randy Galpin ("Mr. Galpin"). (Tr. at 86, 244–245, 369.) Laura Box ("Ms. Box"), as the Sales Manager, worked "to increase sales" within the Service and Parts departments at Kenworth's Dothan office.[2] (Tr. at 136–138, 461.) She also supervised Kenworth's Birmingham sales representatives. (Tr. at 138.) Plaintiff, Mr. Davenport and Mr. Brooks worked in the Dothan office. (Tr. at 35–36, 86.) Ms. Box worked out of Kenworth's Birmingham office. (Tr. at 138.)

Jeff Weaver ("Mr. Weaver"), in turn, supervised Mr. Davenport, Mr. Brooks and Ms. Box. (Tr. at 86–88, 246.) Andrew Thurmond ("Mr. Thurmond") was the Director of Operations. (Tr. at 472.) His job responsibilities included, among other things, overseeing the Human Resources Department. (Tr. at 195–196.) In this capacity, Mr. Thurmond was responsible for "communicat[ing]" Kenworth's personnel policies to all employees upon hiring and throughout their employment as necessary. (Tr. at 197–198.) Robert Mitchell ("Mr. Mitchell") was the owner and President of Kenworth. He was responsible for hiring and firing employees, as well as formulating personnel policies with input from others, such as Mr. Thurmond. (Tr. at 197, 213, 445, 452, 463.) Mr. Mitchell, Mr. Weaver and Mr. Thurmond worked in the Birmingham office. (Tr. at 86, 87–88, 246.)

When Plaintiff began his employment with Kenworth, some employees called him "Julio" and "Taco," nicknames that had "followed" him to Kenworth. (Tr. 32–33, 36–37, 41–42, 57.) While Plaintiff did not ask to be called, or introduce himself as, either "Julio" or "Taco," these two nicknames did not "bother" him. (Tr. at 36–37, 57.) However, the name calling intensified when Mr. Galpin was hired to work as the Shop Foreman under Mr. Brooks. (Tr. at 41, 469–470.) Mr. Galpin was hired on November 17, 1997. (Tr. at 364, 369, 469–470.)

Three or four times a day, Mr. Galpin would call Plaintiff derogatory names, such as "Wetback," "Spic" and "Mexican Mother Fucker." (Tr. at 41–42, 44.) Mr. Galpin would "use those derogatory remarks" when he was "demanding [Plaintiff] to do something" or when Plaintiff was not working "fast enough." (Tr. at 42, 44.) Plaintiff unsuccessfully asked Mr. Galpin to stop calling him names. (Tr. at 42.) Lisa Potts ("Ms. Potts"), a co-employee of Plaintiff, and Mr. Tew witnessed the name calling. Ms. Potts visited Plaintiff at the Back Parts Counter usually twice a day on her break. (Tr. at 173–174.) "[M]ore times than not" she heard either Mr. Galpin or some of the Service Technicians call Plaintiff "Spic," "Wetback," "Taco" or "Mexican MF." (Tr. at 170–174, 177–179, 193.) Mr. Tew, who worked with Plaintiff at the Back Parts Counter, also heard Mr. Galpin call Plaintiff "Wetback Mother Fucker" and "Spic Boy," approximately two or three times a day. (Tr. at 108, 110, 111–113.)

Plaintiff never complained about the "name calling" to Mr. Davenport, his direct supervisor. (Tr. at 84–85.) However, when asked if he ever "complained to the management of Kenworth about the language that [Mr.] Galpin was using," Plaintiff responded as follows:

> On one occasion [Mr.] Brooks come [sic] by the Back Parts Counter and I mentioned something to him about it, but we

**2.** Ms. Box, however, did not visit the Dothan office often. (Tr. at 143.)

never did any big incident report or anything like that, it's just the fact that he might have overheard it and asked me or because me and [Mr. Galpin] may have just had an incident and I wanted to tell him about it.

(Tr. at 71.) In sum and substance, Plaintiff told Mr. Brooks the following: "You need to tell [Mr. Galpin] : . . to watch what he says to me." (Tr. at 72, 84.) However, Plaintiff did not "go into detail about what [he] was complaining," because he believed that Mr. Brooks knew about the name calling. (Tr. at 72.) Plaintiff based this belief on the fact that Mr. Brooks was present in the shop when Mr. Galpin would call him derogatory names.[3] (Tr. at 42–43, 72.) In addition, Mr. Brooks, Mr. Davenport and Mr. Galpin's offices were in close proximity to each other and to the shop, where the name calling occurred. (Tr. at 43.) While Mr. Brooks denied that he ever heard Mr. Galpin call Plaintiff any racial names "directly," he did hear Mr. Galpin refer to Plaintiff as a "damn Mexi-

can" and "possibly" a "Mexican Mother Fucker." (Tr. at 249–250, 264–265.)

Moreover, on one occasion, Ms. Box overheard Wendell Tew ("Mr. Tew") refer to Plaintiff as "Julio" or "Taco." (Tr. at 38, 140–142, 220, 322–323.) Plaintiff told Ms. Box that he was not "bother[ed]" that his co-employee had called him this name. (Tr. at 38–39, 69.) Nonetheless, Ms. Box reported the incident to Mr. Weaver, who in turn informed Mr. Mitchell. (Tr. at 142, 156–157, 296.)

As a result, Mr. Mitchell instructed Mr. Thurmond to review Kenworth's anti-discrimination policies with all the employees, which Mr. Thurmond did at the regularly scheduled monthly safety meeting.[4] This meeting was held on November 18, 1997. (Tr. at 39, 63, 158, 220, 224, 461–463, 469–470.) Mr. Thurmond instructed the employees "that the racial names were going to stop" and that anyone "caught" uttering a "racial" slur "would be terminated on the spot." (Tr. at 40, 81, 220–224.) He re-

---

3. Plaintiff testified as follows:

Q. Do you know for a fact that [Mr.] Brooks heard conversations between you and [Mr.] Galpin?
A. Yes
Q. How do you know that?
A. Because he was in the shop when it happened.
Q. Well, do you know he heard it?
A. I am not [Mr.] Brooks, I couldn't tell you if he heard it or not for sure.

(Tr. at 72.) Additionally, when asked whether Mr. Galpin's derogatory comments were "ever made in front of either [Mr.] Davenport or [Mr.] Brooks or other management employees," Plaintiff responded that "[y]es, there were management employees there at some times." (Tr. at 43.)

4. Kenworth has two written policies pertinent to this action, which were discussed at the meeting: (1) a "Sexual Harassment Policy" and (2) a "Work Place Conduct Policy." (Tr. at 198–201, 446; Pl.'s Ex. 1.) Kenworth's one-page "Sexual Harassment Policy" is divided into three sections. The "Policy" Section states as follows:

The harassment of employees on the basis of sex is a violation of Title VII of the Civil Rights Act of 1964, as amended. It is the policy of Kenworth of Dothan, Inc. that acts

of sexual harassment are prohibited and will not be tolerated. Any employee involved in sexual harassment will be subject to discipline up to and including termination.

(*Id.*) The "Definition" section defines "Overt Sexual Advances," "Sexually Offensive Language," and "Physical Contact." (*Id.*) Finally, the "Procedure" Section explains the system by which employees should voice grievances:

It is the policy of the company that any and all complaints of sexual harassment or intimidation should be immediately reported to a member of management that you feel comfortable discussing the matter with or directly to the President of the Company. After an incident is reported a full investigation will begin immediately on the situation.

(*Id.*) The second policy, entitled "Workplace Conduct Policy," states in its entirety:

All employees of this Company are to conduct themselves in a professional, mature manner and be polite and cordial to all customers, vendors, and other employees. The following is a list of behaviors that will not be tolerated.· The list includes[,] but is not limited to[,] the use of profanity, vulgar language, fighting, discriminatory remarks or name calling.

(*Id.*)

minded employees to immediately report any inappropriate behavior. (Tr. at 463.) Ms. Box, who also attended the meeting, stated that Mr. Thurmond explained the policies "in detail," such as what actions employees should take if they felt that they were "being discriminated against or harassed." (Tr. at 145.) Mr. Brooks also was present at this meeting. (Tr. at 263–264.)

After this meeting, neither Mr. Mitchell, Ms. Box, Mr. Weaver nor Mr. Thurmond asked Plaintiff whether the name calling had stopped. (Tr. at 145, 212, 299, 479–480.) Nonetheless, with the exception of Mr. Galpin, Plaintiff says that, after the meeting, the racial slurs ceased for the most part: "[S]ometimes [the name calling] would happen but not near as often, and most times people would catch themself [sic]; they would say 'I am sorry, Bradley,' because they didn't want to get terminated ...." (Tr. at 40, 41, 83–84.) Plaintiff asserts that Mr. Galpin continued to harass him until Plaintiff was fired on December 22, 1997.[5] Furthermore, Plaintiff maintains that Mr. Galpin's racial name calling "bother[ed]" him. (Tr. at 41.)

### B. The Jury Charge

Both Plaintiff and Kenworth were satisfied with the jury charge and had no exceptions thereto. (Tr. at 573.) In instructing the jury on punitive damages, the court gave the following charge:

The Plaintiff also claims that the acts of the Defendant were done with malice or reckless indifference to the Plaintiff's federally protected rights so as to entitle the Plaintiff to an award of punitive damages in addition to compensatory damages.

If you find for the Plaintiff, and if you find further that a higher management official of the Defendant personally acted with malice or reckless indifference to the federally protected rights of the Plaintiff, the law would allow you, in your discretion, to [assess] punitive damages against the defendant as punishment and as a deterrent to others.

Malice or reckless indifference means that the Defendant's conduct was motivated by an evil motive or intent, or involved reckless or callous indifference to the federally protected rights of others. In other words, an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable for punitive damages. If you find that punitive damages should be assessed against the Defendant, you may consider the financial resources of the Defendant in fixing the amount of the damages.

This next charge on the law of punitive damages applies only to the Plaintiff's hostile or abusive work environment claim. If you find that the discriminatory actions of the Defendant's employees were contrary to the Defendant's good faith efforts to comply with federal laws by implementing programs or policies to prevent discrimination in the workplace, then you may not award punitive damages against the Defendant. On the other hand, if you find that the Defendant did not engage in good faith efforts to comply with federal laws by implementing programs or policies to prevent discrimination in the workplace, then you may consider awarding punitive damages.

(Tr. at 556–557.)

### C. The Special Interrogatories

In finding in favor of Plaintiff on his hostile work environment claim, the jury answered special interrogatories and found the following by a preponderance of the evidence: (1) that Plaintiff was subjected to a hostile work environment; (2) that the hostile work environment was created or permitted by a supervisor with immediate

---

**5.** According to Kenworth, Plaintiff was fired based upon poor job performance and because he had a "vengeful attitude" toward the

managerial employees. (Tr. at 50–51, 305, 309–311.)

or successively higher authority over Plaintiff; (3) that Mr. Galpin was Plaintiff's co-employee, not a supervisor; (4) that Mr. Brooks was a supervisor with immediate or successively higher authority over Plaintiff; and (5) that the hostile work environment resulted in a tangible employment action. (Tr. at 586–588.) Moreover, in awarding punitive damages, the jury answered "yes" to the following question: "Do you find from a preponderance of the evidence that the Defendant acted with malice or reckless indifference to the Plaintiff's federally protected rights and that punitive damages should be assessed against the Defendant." (Tr. at 588.)

## V. DISCUSSION

In its post-verdict Memorandum, Kenworth has argued the following grounds in support of its Motion For Judgment As A Matter Of Law: (1) Plaintiff "failed to present substantial evidence that the conduct allegedly creating a hostile environment was severe and pervasive such that it altered the terms or conditions of his employment"; (2) Plaintiff "failed to present any evidence that Kenworth knew or should have known of the alleged harassment and failed to take prompt remedial action"; (3) Plaintiff "failed to present any evidence that a supervisor with immediate or successively higher authority over him created the hostile work environment"; and (4) "the Court should not have submitted the issue of punitive damages to the jury as there is no legally sufficient basis for a reasonable jury to award punitive damages." (Mem. at 2–3.)

In viewing the evidence in the light most favorable to Plaintiff, the court finds that a "legally sufficient evidentiary basis" exists to support the jury's verdict on all four grounds argued in Kenworth's Memorandum. FED.R.CIV.P. 50(a); see also Mendoza, 195 F.3d at 1244. While the court finds that Kenworth's first, second and third grounds warrant no discussion, the

court will address Kenworth's fourth ground challenging the sufficiency of the evidence on punitive damages. For the reasons that follow, the court finds that the issue of punitive damages was properly submitted to the jury.

■ Under Title VII, an employee may recover punitive damages where an employee "engage[s] in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." [6] 42 U.S.C. § 1981a(b). Recently, in Kolstad v. American Dental Ass'n, 527 U.S. 526, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999), the Supreme Court clarified the standard for measuring an employee's entitlement to punitive damages under Title VII. Under the holding in Kolstad, an employee must demonstrate the following to be entitled to punitive damages: (1) that the employer acted with "malice or reckless indifference," an inquiry which "ultimately focus[es] on the actor's state of mind," id. at 2124; (2) that the employee causing or permitting the unlawful discrimination works in a " 'managerial capacity,' " id. at 2128; (3) that the managerial employee was " 'acting within the scope of employment,' " id.; and (4) that the managerial employee's unlawful discrimination is not "contrary to the employer's 'good-faith efforts to comply with Title VII.' " Id. at 2129. A plaintiff must prove these four elements by a preponderance of the evidence. See Knowlton v. Teltrust Phones, Inc., 189 F.3d 1177, 1186 (10th Cir.1999) ("The plaintiff's burden of proof on punitive damages is a preponderance of the evidence.").

The court now will address each of the four Kolstad factors. Under the first factor, Kenworth argues that there are no facts upon which a jury could find malice or reckless indifference because insufficient evidence exists that Kenworth had actual knowledge of the hostile work envi-

---

**6.** The standard for awarding punitive damages is the same under Title VII and § 1981. See Deffenbaugh–Williams v. Wal–Mart Stores,

Inc., 188 F.3d 278, 283 (5th Cir.1999). Thus, the court need not conduct a separate analysis under § 1981.

ronment. Namely, Kenworth argues that it had knowledge that Plaintiff was called a derogatory name only on one occasion when Ms. Box overhead Mr. Tew call Plaintiff either "Julio" or "Taco" and that it acted promptly by holding a meeting.[7] (Mem. at 28–29.)

■ The court agrees with Kenworth that the issue of actual knowledge is important in evaluating the sufficiency of the evidence to support the punitive damages award. That is, in the Eleventh Circuit, "punitive damages will ordinarily not be assessed against employers with only constructive knowledge" of the Title VII violations. *Dudley v. Wal–Mart Stores, Inc.*, 166 F.3d 1317, 1322 (11th Cir.1999). However, the court rejects Kenworth's argument that it had notice of potential harassment only on a single occasion. Specifically, the court finds that Plaintiff presented sufficient evidence for the jury to conclude that, on occasions other than the one instance cited by Kenworth above, Kenworth had actual knowledge of the harassment through Mr. Brooks.

The evidence from which a jury could infer actual knowledge is twofold. First, the court finds that a reasonable jury could conclude that Plaintiff complained to Mr. Brooks about the harassment, thereby, placing Mr. Brooks on actual notice. *See Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 647 (11th Cir.1997) (holding that a plaintiff can prove that an employer has actual notice by demonstrating that he or she "complained to higher management"). That is, Plaintiff told Mr. Brooks the following: "You need to tell [Mr. Galpin] to watch what he says to me." (Tr. at 72,

84.) While Plaintiff did not recite the particulars of "what" Mr. Galpin was saying, there was evidence from which the jury could infer that Mr. Brooks knew the basis of Plaintiff's complaint. Indeed, Mr. Brooks admitted that, in conversation(s) between himself and Mr. Galpin, Mr. Galpin referred to Plaintiff as a "damn Mexican" and possibly a "Mexican Mother Fucker." (Tr. at 250, 264–265.) Mr. Brooks' admission constitutes circumstantial evidence from which a jury could infer that Mr. Brooks knew that Plaintiff was referring to Mr. Galpin's use of these or other similar discriminatory names. Moreover, Mr. Brooks' silence in response to Plaintiff's comment and Mr. Brooks' failure to make any additional inquiries of Plaintiff could further lead the jury to conclude that Mr. Brooks did not need to ask Plaintiff about what he was complaining because Mr. Brooks knew.

■ Second, the court finds that there was ample evidence from which a jury could conclude that Mr. Brooks heard Mr. Galpin call Plaintiff derogatory names. That is, Plaintiff testified that Mr. Brooks was "in the shop" when the name calling occurred and that Mr. Brooks or other management employees were "there" when Mr. Galpin was calling Plaintiff racial names. (Tr. at 43, 72.) Although Mr. Brooks denied hearing Mr. Galpin call Plaintiff names to Plaintiff's face, that was a factual question for the jury to resolve. The jury, which was properly instructed on the law of punitive damages (Tr. at 556–557), obviously found that Mr. Brooks was in earshot of Mr. Galpin when Mr. Galpin called Plaintiff racial names.[8] According-

---

**7.** Plaintiff, on the other hand, does not specifically address Kenworth's "notice" argument but, rather, generally argues that "Kenworth acted, at the very least, with a reckless disregard of [Plaintiff's] rights" and that the jury "need only have looked as far as [Mr.] Brooks' conduct" to award punitive damages. (Resp. at 17.) For the reasons discussed below, the court agrees with Plaintiff that a reasonable jury could conclude that Mr. Brooks' actions, or lack thereof, demonstrated a "reckless indifference" attributable to Kenworth.

**8.** The court notes that the evidence also demonstrates that Kenworth had constructive knowledge of the harassment. In determining whether harassment is so pervasive as to place an employer on constructive notice, the Eleventh Circuit has considered the following factors: (1) "the remoteness of the location of the harassment as compared to the location of management"; (2) "whether the harassment occurs intermittently over a long period of time"; (3) whether there were only a few, discrete instances of harassment; and (4) "whether the victims were employed on a

ly, the court finds that the evidence supports a finding that Mr. Brooks had actual knowledge of the harassment.

■ The court further finds that the evidence supports a finding that Mr. Brooks acted with a reckless indifference to Plaintiff's federally protected rights. "Malice" and "reckless indifference," as those words are used in Title VII, "pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." *Kolstad,* 119 S.Ct. at 2124. "An employer must at least discriminate in the face of a perceived risk that its actions will violate federal law." *Id.* Thus, determining whether an employer acted with malice or reckless indifference is a subjective inquiry that "ultimately focuses on the actor's state of mind." *Id.* In other words, a plaintiff does not have to show "egregious or outrageous discrimination independent of the employer's state of mind." *Id.; see also Dudley,* 166 F.3d at 1322 (holding that, for purposes of awarding punitive damages under Title VII, an example of "egregious" discrimination would include "a blatant disregard for civil obligations").

■ In applying these principles, the record demonstrates that, when Plaintiff mentioned the name calling to Mr. Brooks, Mr. Brooks said nothing and did nothing in response. Despite the fact that Mr. Galpin worked under Mr. Brooks, Mr. Brooks did not even confront Mr. Galpin to inquire further about Plaintiff's comment. (Tr. at 245, 250.) Mr. Brooks again said nothing when he heard Mr. Galpin refer to Plaintiff as a "damn Mexican" and possibly a "Mexican Mother Fucker." (Tr. at 250, 264–265.) Mr. Brooks likewise did not mention to his superiors that Plaintiff had lodged a complaint, despite his clear duty as a supervisory employee to report to higher management any inappropriate behavior.[9] (Tr. at 211–212, 304, 450.) Mr. Brooks' indifference is further reflected through his own admission that, despite being a management employee, he never bothered to read any of Kenworth's policies. (Tr. at 247–248.) While the court recognizes that working in a truck repair shop is not the same as a tea party, Mr. Brooks, as a management employee, violates Title VII when he "condone[s] an environment at the workplace which significantly and adversely affects an employee because of his race or ethnicity." *Henson v. City of*

---

part-time or full-time basis." *Allen,* 121 F.3d at 647. Under the first *Allen* factor, both Mr. Davenport and Mr. Brooks' offices were near the shop where the name calling occurred. Also, Mr. Brooks and other management employees were present in the shop when Mr. Galpin called Plaintiff derogatory names. (Tr. at 42–43, 72.) Based on this evidence, the court finds that management employees were in close proximity to the harassing conduct. Thus, the jury could easily infer that Kenworth's management employees witnessed the name calling.

Under the second and third *Allen* factors, Mr. Galpin called Plaintiff derogatory names, such as "Wetback," "Spic" and "Mexican Mother Fucker," three or four times a day. Moreover, at least occasionally, the Service Technicians joined in the name calling. (Tr. at 41–42, 44.) Based on this evidence, the court finds that sufficient evidence exists to support a finding that the daily name calling was not intermittent and occurred regularly during the timeframe when Mr. Galpin and Plaintiff's employment overlapped.

Finally, under the fourth *Allen* factor, both the primary harasser (Mr. Galpin) and the victim (Plaintiff) were full-time employees and shared similar work schedules with each other and with management employees. Therefore, the fourth factor further supports the conclusion that Kenworth had constructive knowledge of the harassment. In sum, the court, in applying these factors, finds that the evidence demonstrates pervasive harassment so as to place Kenworth on constructive notice of Plaintiff's harassment.

9. Mr. Brooks testified as follows:

Q. [Y]ou never initiated any kind of investigation or requested anybody else in management to investigate any allegations that [Plaintiff] felt like he was being discriminated against or treated in a hostile manner because of the way he was being talked to at Kenworth … after you received that information from [Mr.] Galpin, did you?
A. No.
(Tr. at 254.)

*Dundee,* 682 F.2d 897, 901 (11th Cir.1982); *see also Knowlton,* 189 F.3d at 1187 (holding that where the evidence supported a finding that management was "unmistakably aware" of the hostile environment and of the supervisor's behavior, but was "unresponsive" to the plaintiff's complaint, the issue of punitive damages was properly submitted to the jury). In sum, the court finds that evidence exists from which the jury could conclude that Mr. Brooks' inaction exceeded the permissible and constituted a reckless indifference as to Plaintiff's federally protected rights.

■ Under the second *Kolstad* factor, in determining whether Mr. Brooks acted within a managerial capacity, courts should be guided by common law agency principles. *See* 119 S.Ct. at 2128. Although common law agency principles do not provide a precise definition of "managerial capacity," the Supreme Court advised in *Kolstad* that "an employee must be 'important,' but perhaps need not be the employer's 'top management, officers, or directors,' to be acting 'in a managerial capacity.'" *Id.* at 2128. Moreover, in *Dudley,* the Eleventh Circuit held that to be entitled to punitive damages, "a Title VII plaintiff must show either that the discriminating employee was 'high[ ] up the corporate hierarchy,'" or that upper management "countenanced or approved" the conduct.[10] 166 F.3d at 1323 (citations omitted).

Kenworth contends that "Mr. Brooks is not a member of Kenworth's higher management as required under *Dudley.*" (Reply at 11.) The court disagrees. That is, the court finds that Mr. Brooks' position at Kenworth is easily distinguishable from the Wal–Mart managers' status in the *Dudley* case. Unlike Wal–Mart, Ken-

worth has less than 150 employees with offices in only two locations. Kenworth also has far fewer management employees in its corporate structure than Wal–Mart. Despite the foregoing, Kenworth argues that the lone fact that "Wal–Mart's corporate hierarchy is many times the size of Kenworth's corporate hierarchy" is an insufficient basis upon which to "punish" Kenworth. (Reply at 10.) The court, however, does not base its finding solely on the size of Kenworth. The court also finds that Mr. Brooks' job responsibilities and position within Kenworth sufficiently demonstrate that he served in a managerial capacity. As a "management employee," Mr. Brooks was in charge of overseeing the operations of his department, as well as disciplining employees within his department. (Tr. at 244, 245, 247, 479.) In fact, during Plaintiff's employment, he and Mr. Davenport were the only two managers assigned full-time to the Dothan office and, thus, were the highest ranking managers at the Dothan office. (Tr. at 246, 476, 491.)

Kenworth attempts to minimize Mr. Brooks' managerial role by emphasizing that Mr. Brooks "was not responsible for formulating policy and that Mr. Brooks could not make any personnel decisions without approval of upper management employees such as [Mr.] Mitchell, [Mr.] Weaver, or [Mr.] Thurmond." (Reply at 11–12.) Nonetheless, the record reveals that Mr. Brooks was authorized to make discretionary recommendations about employment and that Mr. Mitchell relied heavily on information obtained from his managers. (Tr. at 482.) In fact, Mr. Brooks was the individual who initiated Plaintiff's termination by complaining to Mr. Weaver about Plaintiff's job perfor-

10. In *Dudley,* the jury found that a Wal–Mart store manager and co-manager intentionally discriminated against an employee on the basis of her race by demoting her, in violation of Title VII, and awarded punitive damages. 166 F.3d at 1319–1320. In reversing the punitive damages award, the Eleventh Circuit explained as follows: "Wal–Mart is a giant business; the record shows that Wal–Mart has more than 2000 stores. Neither of these men is high enough up Wal–Mart's corporate hierarchy—if they can be said to be in the corporate management hierarchy at all—to allow their discriminatory acts to be the basis for punitive damages against the corporation." *Id.* at 1322.

mance and by reporting to Mr. Davenport that Plaintiff had a "vengeful attitude." (Tr. at 253–254, 259–260, 311, 313, 463); *E.E.O.C. v. Wal–Mart Stores, Inc.*, 187 F.3d 1241, 1247 (10th Cir.1999) (holding that an assistant manager for Wal–Mart, who had "independent authority to suspend her subordinates" and to "make hiring and firing recommendations," served in a "managerial position[ ]" within the meaning of *Kolstad,* 119 S.Ct. at 2128). Moreover, Mr. Brooks' supervisor, Mr. Weaver, worked directly for the President, thus, placing Mr. Brooks two levels from the top executive. Therefore, in Kenworth's hierarchy of management employees, the court finds that a reasonable jury could conclude that Mr. Brooks was an "important" executive. *Kolstad,* 119 S.Ct. at 2128. In sum, the court finds that evidence exists from which a jury could infer that Mr. Brooks worked in a managerial capacity so as to hold Kenworth liable for punitive damages.

 Under the third *Kolstad* factor, the court finds that sufficient evidence exists from which the jury could conclude that Mr. Brooks was acting within the scope of his employment when he essentially turned a blind eye to Mr. Galpin's harassing conduct. Kenworth employed Mr. Brooks to supervise and manage the employees within his department, one of those employees being Mr. Galpin. As discussed previously, Mr. Brooks took no action against Mr. Galpin, despite the fact that Mr. Galpin was an employee in Mr. Brooks' department. (Tr. at 250.) Likewise, Mr. Brooks, as a management employee, had a duty pursuant to company policy to report to his superiors any inappropriate behavior, which he failed to do. (Tr. at 211–212, 304, 450, 477.) The court finds that Mr. Brooks' actions, or lack thereof, were inextricably intertwined with

his employment by Kenworth and support a finding that Mr. Brooks was acting within the line and scope of his authority. *See Knowlton,* 189 F.3d at 1187 (In holding that evidence existed from which a jury could award punitive damages in a Title VII action, the Tenth Circuit stated that the "management's reaction to [the plaintiff's] complaint was unresponsive."); *Kolstad,* 119 S.Ct. at 2128 ("[E]ven intentional torts are within the scope of an agent's employment if the conduct ... occurs substantially within the authorized time and space limits, and is actuated, at least in part, by a purpose to serve the employer.").

 Finally, under the fourth *Kolstad* factor, the court must decide whether the evidence supports a finding that Mr. Brooks did not act contrary to Kenworth's good-faith efforts to comply with Title VII's prohibitions against race discrimination.[11] Kenworth argues that it "had established policies prohibiting discriminatory conduct in the workplace." (Mem. at 30.) Plaintiff, on the other hand, contends as follows: "At best, Kenworth ... had an ineffective or incomplete policy; and, as attested to by every member of Kenworth's management team, absolutely no investigation was conducted, although [Kenworth's] [S]exual [H]arassment [P]olicy clearly states that a 'full investigation' should have been performed." (Resp. at 16.) For the reasons to follow, the court agrees with Plaintiff.

Under *Kolstad,* an employer's adoption of anti-discrimination policies is an important factor in examining whether an employer has exercised good faith. *See* 119 S.Ct. at 2129. However, a policy alone is not sufficient as a matter of law to establish an employer's good faith. *See*

---

**11.** In *Kolstad,* the Supreme Court explained as follows:

> Recognizing Title VII as an effort to promote prevention as well as remediation, and observing the very principles underlying the Restatements' strict limits on vicarious liability for punitive damages, we agree

that, in the punitive damages context, an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's "good-faith efforts to comply with Title VII." 119 S.Ct. at 2129.

*E.E.O.C.,* 187 F.3d at 1248 (holding that "Wal–Mart certainly had a written policy against discrimination, but that alone is not enough"); *Deffenbaugh–Williams,* 188 F.3d at 285 (stating that evidence that Wal–Mart "encourage[d] employees to contact higher management with grievances" does not "establish, as a matter of law, Wal–Mart's good faith in requiring its manager to obey Title VII"). The court recognizes that Kenworth implemented a Workplace Conduct Policy and a Sexual Harassment Policy, the latter of which encourages employees to contact any member of management with discrimination-based grievances. However, the court finds that evidence exists from which a reasonable jury could have concluded that these two policies were less than effective for thwarting race discrimination. For instance, while Kenworth's Workplace Conduct Policy prohibits "the use of . . . discriminatory remarks or name calling," *see supra* n. 3, it does not provide any procedures that an employee should take if he or she is the victim of the proscribed conduct. Additionally, the Sexual Harassment Policy addresses only sexual harassment, not race discrimination.

Moreover, the court finds that the testimony of Kenworth's employees provides sufficient evidence from which the jury could reject Kenworth's argument that it had made good faith efforts to inform its employees about Title VII's racial prohibitions. Mr. Tew testified that the November 1997 meeting conducted by Mr. Thurmond was the first time that Kenworth had informed him of a "harassment" policy.[12] (Tr. at 132.) Ms. Potts said that, while a discrimination policy may have been "mentioned" when she was hired, she never received documentation about any anti-discrimination policies in place at Kenworth. (Tr. at 174–175, 182–183.) Ms. Box further admitted that she did not know if a harassment policy relating to race and/or national origin was posted at Kenworth during Plaintiff's employment.[13] (Tr. at 142–143.) Mr. Thurmond, who was responsible for informing employees of Kenworth's policies, confirmed that the Workplace Conduct Policy and the Sexual Harassment Policy were not posted at Kenworth's Dothan office. (Tr. at 204). Furthermore, although Mr. Thurmond stated that the latter two policies were provided to all new employees, he could not explain why these policies were not in the personnel files of Plaintiff or of Mr. Tew. (Tr. at 197, 205–06, 231–232, 240.) Also, Mr. Brooks admitted that, despite being a management employee, he never read any of Kenworth's policies. (Tr. at 247–248.) Even the President himself testified that he had never read Kenworth's Sexual Harassment Policy. (Tr. at 474.) Based on the foregoing evidence, the court finds that the jury reasonably could have concluded that Kenworth "failed to educate" its employees of Title VII's racial prohibitions and failed "to prevent discrimination in the workplace." *E.E.O.C.,* 187 F.3d at 1249.

## VI. CONCLUSION

In sum, the court finds that Plaintiff submitted sufficient evidence so that a reasonable jury could decide in favor of Plaintiff on the four *Kolstad* factors; thus, the issue of punitive damages was properly submitted to the jury. The evidence demonstrates that Kenworth, through Mr. Brooks, acted with "reckless indifference" to Plaintiff's federally protected rights. *Kolstad,* 119 S.Ct. at 2124. In addition, there was a sufficient basis for imputing to Kenworth liability for punitive damages. That is, the evidence supports a finding that Kenworth's managerial agent, Mr. Brooks, while acting within the line and

---

**12.** Mr. Tew further stated that if the harassment policy was posted on a bulletin board, he "didn't ever see it" and "was never given a copy of it." (Tr. at 132.)

**13.** Although Ms. Box said that Kenworth's policies were located in a binder at the Birmingham office, she did not know if these "policies" were maintained in the Dothan office. (Tr. at 143.)

scope of his employment, had knowledge of the harassment, but failed to take any action. Finally, the evidence demonstrates that Mr. Brooks did not act contrary to Title VII's good faith requirements to comply with Title VII.