Sharlyn MONLEY, Plaintiff,

v.

**Q INTERNATIONAL COURIER, INC., etc., Defendant.**

**No. 99 C 3557.**

United States District Court, N.D. Illinois, Eastern Division.

Jan. 23, 2001.

Joseph A. Morris, Morris, Rathnau &
De La Rosa, Chicago, IL, for Plaintiff.

Michael T. Roumell, Peter A. Stein-
meyer, Epstein, Becker & Green, Chicago,
IL, for Defendant.

## MEMORANDUM OPINION
## AND ORDER

SHADUR, Senior District Judge.

Sharlyn Monley ("Monley") has sued her
ex-employer Q International Courier, Inc.
("Quick"), charging that its termination of
her employment violated Title VII of the
Civil Rights Act of 1964, 42 U.S.C. § 2000e
to 2000e–17 ("Title VII"). According to
Monley's Complaint, she was harassed and
ultimately terminated because of her inter-
racial marriage to a co-worker (Monley is
white and her husband is African–Ameri-
can) and the ensuing birth of their biracial
child.[1]

Quick has moved for summary judgment
under Fed.R.Civ.P. ("Rule") 56. For the
reasons stated in this memorandum opin-
ion and order, Quick's motion is granted
and this action is dismissed.

### Summary Judgment Standards

Familiar Rule 56 principles impose on
Quick the burden of establishing the lack
of a genuine issue of material fact (*Celotex
Corp. v. Catrett,* 477 U.S. 317, 322–23, 106
S.Ct. 2548, 91 L.Ed.2d 265 (1986)). For
that purpose this Court must "read[ ] the
record in the light most favorable to the
non-moving party," although it "is not re-
quired to draw unreasonable inferences
from the evidence" (*St. Louis N. Joint
Venture v. P & L Enters., Inc.,* 116 F.3d
262, 265 n. 2 (7th Cir.1997)). While "this
general standard is applied with added
rigor in employment discrimination cases,
where intent is inevitably the central is-
sue" (*McCoy v. WGN Continental Broad.
Co.,* 957 F.2d 368, 370–71 (7th Cir.1992)),
that does not negate the potential for sum-
mary judgment in cases where a movant
plainly satisfies the Rule 56 standards
(*Washington v. Lake County,* 969 F.2d

---

1. This opinion later deals with Monley's cur-
rent abandonment of that position in favor of
another (and equally meritless) charge of dis-
criminatory treatment.

250, 254 (7th Cir.1992)). In those terms summary judgment is appropriate only if the record reveals that no reasonable jury could conclude that Monley was treated in a statutorily discriminatory fashion (see *Fuka v. Thomson Consumer Elecs.*, 82 F.3d 1397, 1402 (7th Cir.1996) and cases cited there).

As with every summary judgment action, this Court accepts nonmovant Monley's version of any disputed facts. But the level of such acceptance has been limited by the manner in which Monley has approached (or, more accurately, has failed to approach) the requirements of this District Court's LR 56.1, which has been adopted to implement Rule 56.

In that respect LR 56.1(b)(3)(B) provides:

> All material facts set forth in the statement required of the moving party will be deemed admitted unless controverted by the statement of the opposing party.

Although Quick has properly submitted its statement of material facts pursuant to LR 56.1(a)(3), Monley has declined to submit a LR 56.1(b)(3)(A) response or a LR 56.1(b)(3)(B) statement of additional facts.[2] That declination is tempered only somewhat by her having pointed to some additional facts in the body of her Memorandum and having submitted a supplemental filing of the two parts of the record to which her Memorandum has referred.

In light of Monley's noncompliance with LR 56.1(b)(3), this opinion will consider only the additional facts that she has thus adduced, accepting them as true for purposes of the current motion to the extent they controvert any statements made by Quick.[3] All of Quick's remaining statements are deemed admitted (provided of course they are supported by the record). Hence what follows in the *Facts* section is culled primarily from Quick's LR 56.1(a)(3) statement.[4]

### Facts

Quick is in the business of transporting packages on a worldwide basis (¶ 5). It is headquartered in New York and has eight regional facilities, including one in Chicago managed by Ed McNally ("McNally") (*id.*). Monley was hired in Quick's Chicago office on September 26, 1994 as a customer service representative, and she was promoted to dispatcher in the fall of 1995 (¶¶ 10, 16). Keith Wilson ("Wilson") was Monley's supervisor in both of those positions (¶¶ 12, 17).

Monley (then Sharlyn Rogers, but referred to as Monley throughout this opinion to avoid confusion) was initially fired by Quick for absenteeism on July 5, 1996 (¶ 18). Specifically, although Monley's request to take June 28 off had been denied, she failed to report to work that day. Then when she returned to work on July 5, she was terminated for not coming in or calling to notify Quick that she would not be coming in (*id.*). Despite that experience, and later needing experienced help, Wilson rehired Monley as a dispatcher as of September 3, 1996 (¶ 20). Wilson and Chris Kwilosz ("Kwilosz") supervised Monley upon her return.

In early August 1997 Monley commenced a relationship with Jamil Monley, an African–American man who was another dispatcher for Quick then working in the same division (¶ 25). In October Monley's supervisors learned of the relationship and learned that Monley was preg-

---

**2.** Indeed, her Memorandum in Opposition to Defendant's Motion for Summary Judgment (cited "Mem.—") says at Mem. 1:

> Nor is there any dispute as to basic facts.

**3.** Myriad Seventh Circuit opinions support the authority of a district court to enforce the strictures of LR 56.1 to the letter—see, e.g., *Jupiter Aluminum Corp. v. Home Ins. Co.*, 225 F.3d 868, 870–71 (7th Cir.2000). Because

considering the two short deposition excerpts cited in Monley's Memorandum does not force an unwarranted and burdensome judicial hunt through the record, this Court will take those excerpts into account in the interest of not unduly penalizing Monley for her lawyer's flawed workmanship.

**4.** For that reason, all references to that statement will simply take the form "¶ —."

nant (¶ 27). Monleys were married on December 4 (¶ 29). It appears from the parties' current filings that Jamil Monley is still employed by Quick.

After Monley's rehiring there were numerous problems with her performance, attendance and behavior. In one instance she failed to follow certain express instructions from Quick's then Executive Vice President (now Chief Operating Officer) Dominique Brown ("Brown") regarding the handling of one of Quick's largest customers. As a result Brown recommended that Monley be fired, but McNally decided not to discipline her at all (¶ 74). Later that fall (on November 20, 1997) Monley left in the middle of her shift, telling her co-workers that she was quitting. She returned to work three hours later and told McNally that she left because she felt ill due to her pregnancy. Director of Human Resources Eileen Callahan ("Callahan") (who works in Quick's New York office) advised McNally to document the incident but not to act on it because Monley was pregnant and had said she was ill (¶ 34).

Effective December 1 Monley was transferred to Quick's newly acquired "Straightline Division" (¶¶ 36, 40),[5] but her attendance and behavior problems continued. During the final three calendar months of 1997 she was tardy fully 29 times, including 19 times when she was late more than 15 minutes and 5 times when she was more than an hour late (¶ 48). Understandably, Monley's February 6, 1998 performance review by Kwilosz contained a notation that "As of late tardiness has become a problem" (¶ 47). On February 27 Monley was again reprimanded because of her poor attendance: She received two written warnings from McNally's Administrative Assistant Kim Kwilosz, one regarding absenteeism (Monley had been absent two days in excess of her accrued sick time) and one as to tardiness (in the pre-

ceding seven weeks Monley had been late to work 25 more times) (¶¶ 58, 60).

On March 18 Monley discovered that someone had thrown away her coffee mug as part of an office-wide cleanup. She became very upset and started to complain loudly (¶ 68). Shortly thereafter she walked out on her shift and did not return that day (¶ 70). As it happened, Monley's tirade took place in the presence of Brown, who was in from New York giving a tour of Quick's Chicago office to the senior management of Airnet, a prospective acquirer of Quick (*id.*). After witnessing Monley's conduct Brown told McNally that she was a "problem" and that McNally needed "to follow up and to take appropriate action" (¶ 73). Although McNally did not take any action immediately, he later issued three more written reprimands to Monley: first on March 29 for missing a mandatory meeting for dispatchers and drivers, second on March 31 for having walked out on her shift on the preceding November 20 occasion and more recently on March 18, and third on April 2 after Monley had shouted profanities at a co-worker until another co-worker asked her to stop (¶¶ 75, 78, 80).

On March 30 Monley submitted a request for three months' unpaid maternity leave beginning April 13. Because McNally was having problems managing the Division due to interpersonal problems between Monley and other employees, McNally and Callahan decided to offer Monley the week of April 6 off with pay so her leave would effectively begin one week early (¶ 82).

Monley's attendance problems resumed upon her return from leave on July 13: During her first two weeks back on the job she was absent one day and tardy five days, all without excuse (¶ 108). Accordingly, on July 27 McNally presented Monley with a written warning issued by Callahan (¶ 104). Despite receiving that

---

5. After the transfer Monley was supervised by Nui Tanulanond, who reported directly to

McNally (¶ 40).

warning, Monley's attendance problems again resumed unabated (¶ 108), and on August 18 Callahan placed Monley on 90 days' probation (¶ 109).

After McNally gave Monley the memorandum from Callahan notifying her that she had been placed on probation, Monley called Callahan to say that she felt the probation was unfair because she had not received an oral warning before the written warning (¶ 115).[6] Monley then left a message on Brown's voicemail expressing her displeasure at having been placed on probation.

After retrieving Monley's message a few days later, Brown called Callahan and McNally to discuss the situation. When Callahan confirmed that Monley was the same person who had been involved in the coffee mug incident in front of Brown and the Airnet executives and was also the person whom Brown previously had wanted terminated for failing to follow instructions, Brown asked why she was still employed at Quick (¶ 120). Callahan explained that she had recommended against Monley's termination after the coffee mug incident because Monley was pregnant at the time and Callahan had feared she might bring a pregnancy discrimination suit (¶ 121). Brown told Callahan and McNally that she still did not understand why Monley was still working for Quick given her attendance and behavior problems, and she instructed that Monley be terminated that day (¶ 124).

On August 23 McNally told Monley that her employment was over. Monley called Callahan to ask why she was being terminated, and Callahan told her "there is no reason whatsoever" (¶ 132 and Monley Dep. 277).

Monley filed a charge of race and sex discrimination with Equal Employment Opportunity Commission ("EEOC") on November 30, 1998, asserting that she had been harassed and ultimately terminated because of her interracial marriage and biracial child. After she received a right to sue letter on February 26, 1999, she timely filed this action exactly 90 days later.

### Hostile Work Environment

Monley's Complaint was and is framed in terms of her having been subjected to a racially and sexually hostile work environment because of her interracial marriage and biracial child. Nor surprisingly, Quick devoted almost one-third of its initial Memorandum to addressing that claim. But *very* surprisingly, Monley has presented no evidence or argument whatever in support of such a claim in opposition to Quick's Rule 56 motion.

Because Monley bears the burden of proof on that claim (at the summary judgment stage, she bears the burden of at least demonstrating the existence of a material factual issue on that score), her failure to argue it is fatal. In that respect *Larimer v. Dayton Hudson Corp.*, 137 F.3d 497, 500 (7th Cir.1998) has repeated the teaching of *Sample v. Aldi, Inc.*, 61 F.3d 544, 547 (7th Cir.1995):

> If the non-moving party bears the burden of proof on an issue, ... that party may not rest on the pleadings and must instead show that there is a genuine issue of material fact.

In short, Monley's effectively abandoned hostile environment claim is dismissed with prejudice.

### Discriminatory Discharge

■ Even without explicitly stating that an employee's interracial relationship is protected by Title VII, *Taylor v. Western & S. Life Ins. Co.*, 966 F.2d 1188 (7th Cir.1992) has upheld a district court finding that an employer had violated the statute by an adverse employment decision based on its employees' interracial rela-

---

**6.** Although this observation may well have been made at a number of places during this dismal recital of Monley's delinquencies, it is worth pointing out even now that she had been told several times that her absences and tardiness would be excused if she brought in a doctor's note. Yet she never once produced such a note (¶¶ 107, 115).

tionship. Other Courts of Appeals have expressly found persons in such relationships to be within Title VII's protection (see, e.g., *Deffenbaugh–Williams v. Wal–Mart Stores, Inc.*, 156 F.3d 581, 588–89 (5th Cir.1998) and the host of cases cited there). *Tetro v. Elliott Popham Pontiac, Oldsmobile, Buick & GMC Trucks, Inc.*, 173 F.3d 988, 994 (6th Cir.1999) has similarly held (citing earlier cases elsewhere) that Title VII protects a white employee who is discharged because his child is biracial. Indeed, for its part Quick does not argue that Monley does not come under Title VII's mantle. Because this Court agrees entirely with the soundness of such coverage, this opinion turns to considering whether Monley's claim on that score can withstand Quick's motion for summary judgment.

Monley has presented no direct evidence that on its face could support a reasonable inference of unlawful discrimination of that nature (see *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736–37 (7th Cir.1994), describing various types of such evidence). Thus she must attempt to create a presumption of such discrimination via the familiar *McDonnell Douglas* methodology (*Loyd v. Phillips Bros., Inc.*, 25 F.3d 518, 522 (7th Cir.1994)).

■ Here there is no need, however, to go through the several steps in that framework. As this Court (like others) has noted more than once (see, e.g., *Cecilio v. Allstate Ins. Co.*, 908 F.Supp. 519, 529 (N.D.Ill.1995)), it is unnecessary to decide whether an employee has met her burden of establishing a prima facie case if she cannot in any event show[7] that the employer's proffered reason for terminating the employee is pretextual. This opinion therefore cuts directly to the chase: the pretext stage.

In that respect *McCoy*, 957 F.2d at 372 (quotation marks and citations omitted) sets out a plaintiff's burden:

To establish pretext, an employee must ultimately show by a preponderance of the evidence either (1) that the employer was more likely motivated by a discriminatory reason, or (2) that the employer's proffered reason is unworthy of credence. Where, as here, the plaintiff attempts to show the employer's proffered rationale is incredible, [s]he need not present *any* direct evidence of discrimination. As this court has explained, a plaintiff may simply attack the credibility of the employer's proffered reason for termination.

■ Even with that lesser burden, tough, Monley fails abjectly: She offers not a whisper to suggest that decisionmaker Brown has falsely sworn that she was not aware at the time she ordered Monley's termination that Monley was involved in an interracial relationship or was the parent of a biracial child. With no scintilla of evidence that Brown knew that Monley was in a protected class, it cannot reasonably be inferred that Brown discriminated against Monley on that basis (cf. *Rabinovitz v. Pena*, 89 F.3d 482, 488 (7th Cir. 1996)).[8]

Moreover, there is no evidence (nor does Monley argue) that any of the employees who provided Brown with factual information or other input (such as McNally, Callahan and other employees in Quick's human resources department) had any discriminatory animus toward Monley that may have affected the termination decision (see *Oates v. Discovery Zone*, 116 F.3d 1161, 1172–73 (7th Cir.1997)). In sum, Monley has shown no nexus whatever between her protected status and Brown's decision to terminate her.

7. [Footnote by this Court] At this summary judgment stage, of course, Monley need not "show" or "establish" or "prove" anything. Instead she must merely demonstrate the existence of a genuine issue of material (that is, outcome-determinative) fact to defeat Quick's summary judgment motion. Although this opinion will on occasion employ such terms—usually where that terminology is used by the cited cases—this Court has consistently imposed that lesser burden on Monley in testing her claims.

8. See Appendix 1.

Monley has also argued that because her absences and tardiness were directly related to her pregnancy and her postpartum health problems, Quick discriminated against her on the basis of her sex by firing her based on those attendance problems. But those assertions are not "like or reasonably related to" the charges contained in Monley's EEOC charge (*Conley v. Village of Bedford Park*, 215 F.3d 703, 710 (7th Cir.2000)). There Monley said only that she believed she had been terminated because of disapproval of her interracial marriage, not because of absenteeism caused by pregnancy-related health issues. Accordingly, that claim is not properly before this Court (*id.*)—though even brief scrutiny shows it to be without merit anyway.[9]

### Conclusion

This opinion has regrettably given Monley's baseless claims more attention and space than they warrant. Indeed, this case illustrates one unintended consequence of our salutary antidiscrimination laws: Because of the universal knowledge that it takes only an aggressive employee, a complacent lawyer and $150 to embroil any employer in protracted and expensive litigation, an employer may sometimes cut an employee far more slack than he or she deserves, tolerating intolerable behavior in an effort to avert such a groundless involvement. Here any reasonable employer would have been entirely justified in ridding itself of such a totally undependable employee as Monley by firing her long before Quick did so. And Quick's "reward" for having outdone the patience of Job as to Monley and her job was been its forced defense against this bootless lawsuit.

In sum, Monley has waived her hostile environment claim, there is no evidence to support an inference that Quick's proffered justifications for terminating Monley's employment are pretextual, and her newly asserted pregnancy discrimination claim is not properly before this Court. Hence

Quick is entitled to a judgment as a matter of law. Its Rule 56 motion is granted, and this action is dismissed.

### Appendix 1

As the text has shown, Monley has come up totally empty in terms of even inferentially bringing any knowledge home to Brown of the factors that form the gravamen of Monley's EEOC charge and her Complaint here. But even if Monley *had* produced any evidence that Brown was aware of her interracial relationship and her biracial child, she has not identified anything that raises doubt about the credibility of Brown's proffered reasons for terminating her employment.

In attempted support of Monley's pretext argument, she points to Brown's deposition testimony to the effect that Brown did not know whether Monley had any excused absences in the "short period of time" she considered or whether Monley had any attendance problems before that time period (Brown Dep. 86–87, Monley Mem. 3). Contrary to Monley's assertion at her Mem. 3, Brown's lack of information on those specific points in no way suggests that she "really did not know much" about Monley's overall attendance problems. Instead Brown expressly testified that she had been informed by Quick's human resources personnel that Monley had been absent or tardy without excuse "some 30 or 40–some odd times in a very short period of time" (Brown Dep. 85–86)—numbers that Monley does not dispute. That, together with Brown's own observations of Monley's conduct, surely qualifies as sufficient information upon which to make a decision.

Monley also adverts to Callahan's deposition testimony that Brown rejected her advice to wait to fire Monley until she violated the terms of her probation, so that she could then be fired "with cause." But Callahan's disagreement with the timing of Monley's discharge does not at all suggest

---

9. See Appendix 2.

▮▮▮▮▮▮▮

that decisionmaker Brown's proffered reasons are phony or incredible in any respect. Moreover, Callahan's purportedly having responded to Monley's inquiry as to the basis for her discharge by saying "there is no reason whatsoever" (Monley's version) cannot properly be placed at Brown's doorstep—as somehow showing that *Brown* had no reasons for terminating Monley. But even if Brown had not possessed more than ample reasons to fire Monley (as she assuredly did), an employer can of course terminate an at-will employee for no reason at all. Instead it just can't terminate an employee for a prohibited discriminatory reason.

#### Appendix 2

Even though Monley's final claim is not properly before this Court because of its substantive divergence from her EEOC charge, a few words may be added to demonstrate the proverty of that claim too. It takes only a few moment's examination to see that such a claim would fail in any event.

▮ Monley points to absolutely no evidence—not even in her memorandum, let alone in a Rule 56.1(b)(3)(B) statement of additional facts as is required—to support her assertions. Our Court of Appeals consistently teaches that District Courts are under no obligation "to scour the record in search of a genuine issue of triable fact"(*Brasic v. Heinemann's Inc.*, 121 F.3d 281, 285 (7th Cir.1997), quoting *Richards v. Combined Ins. Co.*, 55 F.3d 247, 251 (7th Cir.1995); cf. *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir.1991) ("Judges are not like pigs, hunting for truffles buried in briefs")). Furthermore, contrary to Monley's argument in her memorandum, Title VII does not prohibit an employer from dismissing an employee for excessive absenteeism even if the absences were a direct result of the employee's pregnancy, so long as it does not give better treatment to employees who are equally tardy due to non-pregnancy health reasons (*Troupe*, 20 F.3d at 737). Here there is no record

evidence that Monley's absences and tardiness were a result of her pregnancy or postpartum health, nor is there any evidence that there were equally tardy or absent Quick employees who were not disciplined.