Mary Nell DINKINS, et al., Plaintiffs,

v.

CHAROEN POKPHAND USA, INC., Defendant.

Equal Employment Opportunity Comm'n, Plaintiff,

v.

Charoen Pokphand, USA, Inc., et al., Defendants.

Nos. CIV. A. 99–D–847–N, CIV. A. 99–D–1389–N.

United States District Court, M.D. Alabama, Northern Division.

Feb. 15, 2001.

See also, 133 F.Supp.2d 1237.

Jon C. Goldfarb, Joel S. Isenberg, Kell A. Simon, Nicole L. Gordon, Gordon, Silberman, Wiggins & Childs, Richard F. Horsley, Goozee, King & Horsley, Birmingham, AL, G. Thomas Jackson, Adams, Spivey & Adams, LLC, Clayton, AL, C. Gregory Stewart, Gwendolyn Y. Reams, Equal Employment Opportunity Commission, Washington, DC, Jerome C. Rose, Jill L. Vincent, Mildred Byrd, Pamela K. Agee, Charles E. Guerrier, Equal Employment Opportunity Commission, Birmingham, AL, Elizabeth J. Hubertz, Robinson, Curley & Clayton, PC, Chicago, IL, for Plaintiffs.

Roderick K. Nelson, Patricia Anne Gill, Spain & Gillion, L.L.C., Birmingham, AL, William F. Patty, Daniel O. Rodgers, Beers Anderson Jackson Nelson Hughes & Patty, PC, Montgomery, AL, Horace G. Williams, Courtney Reilly Potthoff, Joel P. Smith, Jr., Horace G. "Chip" Williams, III, Williams, Potthoff, Williams & Smith, LLC, Eufaula, AL, for Defendants.

### *MEMORANDUM OPINION AND ORDER*

DE MENT, District Judge.

This is a consolidated case. Before the court in the *Dinkins* case, 99–D–847–N, are three separate motions: (1) Defendant Patrick Smith's [1] Motion To Dismiss [2]; (2) Defendant Smith's Motion For Partial Summary Judgment [3]; and (3) Defendant Charoen Pokphand USA's [4] Motion For Summary Judgment.[5] Plaintiffs issued Responses, and Defendants filed Replies.

---

1. "Smith."

2. Doc. No. 25.

3. Doc. No. 26.

4. "CP" or "Defendant."

5. Doc. No. 30.

The court also has considered additional materials filed by both parties. After careful consideration of the arguments of counsel, the relevant law, and the record as a whole, the court finds that CP's Motion For Summary Judgment is due to be granted and denied in part, that Smith's Motion For Summary Judgment is due to be granted and denied in part, and Smith's Motion To Dismiss is due to be granted.

## I. JURISDICTION AND VENUE

The court exercises subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1367 (supplemental jurisdiction).

## II. SUMMARY JUDGMENT STANDARD

The court construes the evidence and makes factual inferences in the light most favorable to the nonmoving party. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Summary judgment is entered only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). At this juncture, the court does not "weigh the evidence and determine the truth of the matter," but solely determines whether there is more than "some metaphysical doubt" about whether there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citations omitted); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## III. FACTUAL BACKGROUND

### A. *The Corporate Hierarchy and CP's Harassment Policy*

This case involves allegations of egregious sexual harassment. CP operates a live poultry processing plant in southeast Alabama. The company has a written policy against sexual harassment.[6] Employees should report objectionable behavior to their direct supervisor, the personnel manager, or the human resources manager. The supervisor then has a duty to relay that complaint to an investigatory supervisor. (Def. Ex. KL–7 at 3; White's Dep. at 66–67.) Barry Hilgartner was CP's human resources manager; he reported directly to the company's president, and he supervised personnel manager Kevin Long. (Resp. at 2.)

The policy does not define the term "direct supervisor," and no evidence suggests that the workers were informed exactly who was their direct supervisor at any given time. Within certain areas of the plant, Teresa Baxter, Bobby Burnett, Tate Gatlin, Jerry Marsh, and Patrick Smith acted as supervisors. Above them in the chain-of-command was Kathy Morrow and, above her, was Ferrell Wright. (Hilgartner's Dep. at 103; White's Dep. at 19–21; Doc. No. 101.)

CP publicizes its anti-harassment guidelines in a handbook and a two-page policy

---

**6.** The policy reads, in pertinent part:

The Company will not tolerate sexual or other harassment of any employee at any level, and will investigate all reported incidents of harassment promptly. Anyone engaging in these activities will be subject to appropriate disciplinary action, up to and including immediate termination of employment. Any employee who is subject of [sic] harassing behavior should promptly report the same to his/her direct Supervisor or Personnel Manager for your facility. If they are unavailable or the employee would be more comfortable discussing the matter with either of these individuals, the employee should immediately contact the Human Resource Manager. Employees can be assured that any allegations reported will be investigated and no employee will suffer retribution or reprisal for arising [sic] concerns or reporting incidents of sexual harassment.

Likewise, any person not a victim of such harassment who becomes aware of possible sexual or other harassment should promptly advise your immediate supervisor or Personnel Manager of your work site so that all appropriate steps can be taken to promote an atmosphere free of harassment.
(Def. Ex. KL–7 at 3.)

sheet. The handbook often goes undistributed because it is unavailable. (Long's Dep. at 92–93, 97.) Likewise, although the supervisors ostensibly distribute copies of the policy during orientation, it is not discussed or reviewed. (*Id.* at 150; Pruitt's Dep. at 32.) New employees simply sign the policy and return it to management without receiving a copy themselves. (Resp. at 3; Hilgartner's Dep. at 40.)

CP had no harassment training manual for management until April 1999. (Long's Dep. at 80.) Personnel manager Long "may have glanced over" the manual, but he has never read it. (*Id.* at 82.) Moreover, neither Long, Hilgartner, plant manager Butch White, nor any other lower-level supervisors has ever attended training on ways to prevent and correct sexual harassment.[7] Hilgartner, by all accounts, viewed his investigatory duties as more of a nuisance than anything. (Hilgartner's Dep. at 195–204.)

### B. *The Victims and Their Plight*

#### 1. *Jeanelle Beasley*

*The harassment.* Supervisor Jerry Marsh began tormenting Jeanelle Beasley soon after she came to work. Marsh told Beasley that "every time he looked into her eyes" it made his "dick trickle." He also told her that he had some lotion in his van and wanted to rub her with it. (Beasley's Dep. at 19–21.) Marsh would stand near Beasley, with an erection, simulating masturbation and anal intercourse with Beasley while she worked. He also grabbed Beasley between her legs, touched her breasts, followed her into the restroom and touched her inappropriately.[8] (*Id.* at 19–20, 78–79, 87; Ross's Dep. at 53.) This unseemly conduct took place more than fifteen times over the course of several months. (Beasley's Dep. at 19.)

*The complaints.* Beasley "kept asking Marsh to stop, but he would not stop," so Beasley complained to Burnett and Baxter. (*Id.* at 21–22.) They had Beasley and another employee, Mary Nell Dinkins, write out a statement. Baxter and Burnett said they would bring the complaint to White's attention and said that White would speak with them the next work day. (*Id.* at 24.)

As it turned out, White never intended to meet with Beasley or Dinkins. When Baxter presented the complaint to Morrow, she threw it away and said, "Don't believe nothing they say. They not nothing but troublemakers." (Baxter's Dep. at 155–56.) Beasley finally found White, and he told Beasley that he did not believe her. (Beasley's Dep. at 36.) Marsh's harassment continued. Beasley eventually complained no less than three times, including twice to interim personnel manager Charles Hall. (Resp. at 13–14.) Hall observed that Beasley had filed suit against the company, but he did not elaborate upon this cryptic statement. (Beasley's Dep. at 87–88.)

#### 2. *Mary Nell Dinkins*

*The harassment.* Supervisor Patrick Smith welcomed Mary Nell Dinkins to the plant by asking for her phone number. (Dinkins's Dep. at 34, 37; 52.) When Dinkins responded that she was married, "Smith said he was married too. 'We can zip around and nobody's going to know.'" (*Id.* at 52–53.) Three days later, Smith began touching her buttocks and asking her to meet him at a fine local motel so he could "stick his dick in her pussy." (*Id.* at 62.) Even after Dinkins was transferred to another section of the plant, Smith would walk over, grab the chickens as they passed along the assembly line, spread their legs open, and tell Dinkins that "he was going to have her like that." (*Id.* at 61.)

Smith promised Dinkins a raise and a job transfer if she would have sex with

---

7. *Id.* at 61–66; 117–21; Baxter's Dep. at 201–02, 214–16; Hilgartner's Dep. at 217; White's Dep. at 59–60.

8. Materials contained in an EEOC charge, signed under perjury, are likely to be reduced to admissible form at trial. *See Macuba v. Deboer,* 193 F.3d 1316, 1323 (11th Cir.1999).

him. He also mentioned that he was amenable to group sex. (*Id.* at 50–51, 60.) On at least one occasion, in the presence of witnesses, Smith slipped his hands between Dinkins's legs and ground his erect penis against her buttocks. (*Id.* at 66; Resp. at 19.) Smith asked Dinkins if her husband "ate her pussy" and declared that he could do a better job. He told Dinkins that "after he was finished with her, she would not be able to walk." (Resp. at 17.) This harassment occurred on a daily basis. "And most of the supervisors saw it." (Dinkins's Dep. at 83.)

*The complaints.* During her first week of employment, Dinkins verbally complained to Burnett, who said that Smith "was just playing; don't even pay him no mind." (*Id.* at 64–65.) Dinkins attempted to discuss her plight with Morrow, but Morrow told Dinkins to talk to Baxter. After making four fruitless verbal complaints to Burnett, Dinkins filed a written complaint. Eventually, White spoke to both Dinkins and Smith. Predator and prey presented conflicting stories. (Resp. at 18–19.) Dinkins was sent back to work; her written complaint was thrown away. (Baxter's Dep. at 155–56.)

Smith's misconduct continued well after each of the complaints. The touchings continued on a daily basis, as did the lewd gestures and the comments. Perhaps the crowning moment came when Smith followed Dinkins into the restroom, poked his head under the stall door, and frightened Dinkins while she changed her sanitary napkin. (*Id.* at 75–77.) Dinkins filed a second written complaint over this sickening incident, in response to which Wright said nothing could be done. (*Id.* at 80.)

### 3. Teresa Ross

Smith was not a monogamous harasser. On Teresa Ross's first day at work, Smith inquired into her marital status and volunteered to "take care of her" because she was the only woman on that subsection of the assembly line. (Ross's Dep. at 24.) The next day, he put his arm around Ross

and touched her breasts. When Ross asked Smith, "What's wrong with you?" he snipped, "I see you ain't going to cooperate." (*Id.* at 25–27.)

The next day, Smith tried to kiss Ross on the mouth. He also stood directly behind her while she worked, pressing his pelvis against her buttocks. He continued hovering over Smith and touching her "repeatedly" on a daily basis. (Resp. at 23–24.) Once Beasley transferred into Ross's department, Smith pressured Beasley to disclose Ross's home phone number. Smith also stole Ross's headache medicine, leered at her, and asked, "If I give you your Goody Powder back, what are you going to give me?" (Ross's Dep. at 33.) Evidently frustrated by Ross's refusal to "give it up," Smith followed another female employee into the bathroom and told Ross, "If you ain't going to give me no pussy, I have got to get it from somebody!" (*Id.* at 40–41.)

*The complaints.* Ross went to Wright's office and complained almost immediately. Wright ignored her and walked out the door smoking a cigarette. (*Id.* at 30.) Ross had considered complaining to Morrow, but she had heard Morrow tell Baxter that Ross "made her sick." (*Id.* at 43.) Management did nothing to assist Ross.

### 4. Lillie Phillips

*The harassment.* Lillie Phillips also was a victim of Smith's pathological tendencies. About one month after CP transferred Phillips to Smith's department, the male employees began hanging the chickens with their legs apart spread in a sexually suggestive manner. This excited Smith. "I like the way they have got the birds hanging," he said, stepping behind Phillips and grabbing her breasts. Phillips told Smith to bug off, but he "just kind of sat there and smiled." (Resp. at 26.) That same day, Smith took his break when Phillips and Beasley took theirs. Phillips sat down, and Smith stood close behind her with an erection, so that when she turned her head she almost inadvertently "kissed his ding dong with her mouth." [9]

9. "And I told him to get from behind me.

But he didn't. He just acted like it was a

Phillips also saw Smith touch her sister and overheard Smith's suggestions that they hook up at a local motel. (Resp. at 27.) Furthermore, Phillips's co-workers "constantly" made sexual comments and occasionally touched her inappropriately. Smith saw all of this but did nothing. (*Id.* at 27–28.)

*The complaints.* Phillips complained about the chicken and ding dong incidents to supervisor Baxter. These complaints were reduced to writing and subsequently trashed by Morrow. (Phillips's Dep. at 31–34, 80.) Phillips also complained to Smith about the co-worker harassment. He stood mute. (Resp. at 28.) On the day CP terminated Phillips, White informed her that if she had "helped him with the lawsuit, he would have helped her keep her job." (*Id.* at 17.)

### 5. Gladys Pruitt

*The harassment.* Pruitt's claims are unique in that she was harassed by Smith and others, too.[10] Pruitt was supervised by Smith and Smith's successor, Burnett. When Burnett came to power, he told Pruitt that she would be fired unless she performed tasks such as scraping chicken carcasses off the equipment and the floor. (Pruitt's Dep. at 40–42.) Burnett had previously terminated Pruitt, who is a single mother, but he rehired her out of pity. (*Id.* at 53.) Thus, Pruitt sincerely believed that she would be fired for the slightest mistake, and she took great pains to work diligently.

Not long afterwards, Burnett asked Pruitt if she would mind dating a supervisor. He suggested they meet at the local Wal–Mart. Pruitt agreed to meet him because she felt it was necessary to keep her job. Burnett showed up in his pickup and suggested that they go to a motel. They had sex, and Pruitt's workload soon became easier, for while her previous re-

quests for assistance had been denied, another employee was soon dispatched to sweep and clean the floors. (Resp. at 29–30.) Moreover, on at least eight occasions, Burnett filled out timesheets for Pruitt on days that she did not come to work. As a *quid pro quo,* Pruitt continued to see Burnett socially, and she made out with him in the company steam room a few times. (*Id.* at 30.) "When you gots kids, raising them on your own, you will do anything," she said. (Pruitt's Dep. at 80.)

### 6. Glenda Young

*The harassment.* The final plaintiff is Glenda Young. Employee Patrick Scott and floor supervisor Bernard Cooper victimized Young with a barrage of psychological warfare, stalking, and sexual assault. Scott would lie in wait in the company parking lot until Young arrived at work. Then he would follow Young into the building, grabbing her buttocks and pressing his genitals against her body. He occasionally had an erection. (Young's Dep. at 80–85.) He would childishly splash Young with water and try to trip her while she walked. (*Id.* at 88.)

Supervisor Cooper's behavior also was objectionable. Three or four times a week, Cooper would eyeball Young in a leering manner, grunting, hissing, and panting in the meantime. (*Id.* at 115, 121.) He invited Young to join him for a meeting in the restroom, provided that she brought some lotion to massage his "dickhead." (*Id.* at 116.) Cooper also drove to Young's house one morning, asked if he could come in, and stated that Young could show up for work late if she had sex with him. Young was wearing a robe at the time, and Cooper was "looking her up and down." (*Id.* at 120–21.)

little game, and I just got up and moved . . . . He just laughed like it was funny." (Resp. at 27.)

**10.** Smith manhandled Pruitt and suggested a tryst at Smith's motel of choice. (Pruitt's

Dep. at 84–86.) Pruitt did not complain until after Smith was terminated because "when her sister complained about Patrick they didn't do nothing." (*Id.* at 82–83.)

*The complaints.* Young reported Scott's misconduct to White. Though Scott was eventually terminated, his misbehavior continued until the final moments of his final day. (*Id.* at 85–87; Young Aff.) Young also complained to personnel manager Charles Hall twice. Hall's advice to Young was to take an aspirin, "be strong, and keep your head up." (Young's Dep. at 96.) When Young complained to Cooper, he said that the complaint should remain their dirty little secret. He also told Young that "she owed him one" because he played a role in Scott's termination. (*Id.* at 114, 122.)

## IV. DISCUSSION OF FEDERAL CLAIMS

In their 108–paragraph Complaint, each Plaintiff brings eight causes of action: (1) hostile work environment sexual harassment; (2) retaliation; (3) sex discrimination; (4) race discrimination; (5) invasion of privacy; (6) assault and battery; (7) negligent or wanton training, supervision, and retention; and (8) outrage. Plaintiffs seek recovery on the supplemental claims from both CP and employee Smith. The court considers the federal claims in this opinion, and finds that CP's Motion is due to be denied, but Smith's Motion will be granted.

Before proceeding, however, the court pauses to comment upon a disturbing practice that is spreading like a rash among the plaintiff's bar: bringing suit on behalf of numerous individuals, filing an 80–page response brief, and hoping that the court will erroneously use the evidence supporting the claim of *one* plaintiff to deny summary judgment on the claim of *another* plaintiff. This bundling tactic has no place in American jurisprudence. *It is a practice to be strongly discouraged.*

In the absence of a class, *see* FED. R. CIV. P. 23, a party moving for summary judgment against *A, B* and *C* does so against *A, B,* and *C* individually, not the group as a whole.[11] "[A] motion for summary judgment is the 'functional equivalent' of a trial in which it is asserted that material facts are not in dispute." *Nilssen v. Motorola, Inc.,* 963 F.Supp. 664, 674 (N.D.Ill.1997). Thus, in discharging its summary judgment burden, Plaintiffs' counsel must designate *on behalf of each plaintiff* the "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e).

A blanket rendition of facts in the opening pages of a response brief must be redesignated during the argument section, lest the facts be disregarded. Shotgun pleadings are not allowed; a lawsuit is not a game of hunt the peanut.

Moreover, Plaintiffs' counsel must show how those facts support the claims of each individual litigant, for evidence is not necessarily fungible, and "the onus is upon the parties to formulate arguments." *Resolution Trust Corp. v. Dunmar Corp.,* 43 F.3d 587, 599 (11th Cir.1995).

Counsel simply cannot ask the court to wade through the impenetrable jungle of the record without the guidance of a well-documented pleading that states why summary judgment is inappropriate against *A, B,* and *C.*[12] Failure to do so indicates an absence of proof on the issue at hand. *See Scott v. Dixie Homecrafters,* 125 F.Supp.2d 1311, 1314 n. 6 (M.D.Ala.2000) (limiting plaintiff to nominal damages when defendant argued lack of damages and plaintiff produced no admissible evidence of the same). With those principles in mind, the court turns to the merits of the case.

### A. *Jurisdictional Objections*

At the outset, the court rejects CP's arguments that there is no jurisdiction over any, much less all, of Plaintiffs' claims. CP is particularly troubled that some of Plaintiffs' initial EEOC complaints

---

11. Indeed, CP filed separate, individual memoranda supporting its motion for summary judgment against each Plaintiff. Such fine craftsmanship goes well beyond what Rule 56 requires.

12. *See* Uniform Scheduling Order § 2.

do not list the names of each supervisor or employee that allegedly harassed them. The court finds that such particularity was unnecessary.

There should be no confusion that a Title VII complaint may encompass any kind of discrimination "like or related to" the allegations contained in the employee's original EEOC administrative charge, and growing out of the agency's investigation. *Sanchez v. Standard Brands, Inc.,* 431 F.2d 455, 465 (5th Cir.1970).[13] Thus, the starting point in determining the permissible scope of the judicial complaint is the EEOC charge and investigation. *See Eastland v. TVA,* 714 F.2d 1066, 1067 (11th Cir.1983). Here, the complaints all raised issues of pervasive, systemic, class-wide retaliation and discrimination. EEOC's investigation was equally extensive.[14] Thus, the court finds that all the instant claims are related to, and have grown out of EEOC's analysis of the original complaints. This lawsuit, therefore, may proceed in its entirety.

█ Moreover, notwithstanding Defendant's protests, a district court may never dismiss a Title VII lawsuit solely because EEOC did not issue a timely right-to-sue letter. So long as the plaintiff has filed a proper EEOC charge, her failure to satisfy this condition precedent is cured by the subsequent receipt of the letter. Congress never intended for innocent victims to suffer from the fact that EEOC is sorely overworked and underfunded. *See Kravec v. Chicago Pneumatic Tool Co.,* 579 F.Supp. 619, 621 (N.D.Ga.1983). To the extent that certain Plaintiffs filed suit prematurely, the court finds that these errors have been subsequently cured or will be cured prior to trial. Accordingly, the court turns to the merits of the case.

**B. Hostile Work Environment**

*1. Definition*

█ Title VII forbids employment discrimination on the basis of sex. *See* 42 U.S.C. § 2000e–2(a)(1). Sexual harassment can constitute sex discrimination. *See Mendoza v. Borden, Inc.,* 195 F.3d 1238, 1244–45 (11th Cir.1999) (en banc). "Generally, sexual harassment comes in two forms: harassment that does not result in a tangible employment action (traditionally referred to as 'hostile work environment' harassment), and harassment that does result in a tangible employment action (traditionally referred to as 'quid pro quo' harassment)." *Johnson v. Booker T. Washington Broad. Service,* 234 F.3d 501, 508 (11th Cir.2000).

Each Plaintiff alleges sexual harassment via hostile work environment. The only elements of the prima facie case in dispute are whether Plaintiffs suffered sufficiently severe or pervasive sexual harassment, for which CP could be liable. An analysis of Plaintiffs' work environment is a subjective and an objective one. Given that any honest plaintiff subjectively perceives to have been victimized, the court asks whether a reasonable person in her position would feel the same way. *See Johnson,* 234 F.3d at 509 (citing *Mendoza,* 195 F.3d at 1246).

█ "When determining whether harassment is severe and pervasive, courts consider 'the frequency of the conduct,' 'the severity of the conduct,' 'whether the conduct is physically threatening or humiliating, or a mere offensive utterance,' and 'whether the conduct unreasonably interferes with the employee's job performance." *Id.* (quoting *Mendoza,* 195 F.3d at 1246). In evaluating the plaintiff's work environment, the court may consider abusive acts by co-workers, as well as supervisors. Servants can be just as boorish as

---

**13.** The Eleventh Circuit adopted as binding precedent the decisions of the former Fifth Circuit rendered prior to October 1, 1981. *See Bonner v. Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981) (en banc).

**14.** *See* Doc. No. 76 Ex. 3–4; Doc. No. 78 Ex. F–K; Def. Ex. KL–1 to –6.

their masters. *See Miller v. Kenworth of Dothan, Inc.*, 82 F.Supp.2d 1299, 1307–09 (M.D.Ala.2000).

Here, Plaintiffs were subjected to a continual, sustained barrage of unwelcome comments and touchings, including requests for sex and unwelcome grabbing of their hips, buttocks, breasts, and genitalia. The court finds that a reasonable juror could agree that they labored in a hostile, abusive, and oppressive work environment. *See Dees v. Johnson World Services, Inc.*, 168 F.3d 417, 418–19 (11th Cir.1999).

### 2. Basis of liability

■ Under well-established law, Plaintiffs may hold CP liable for harassment if: (1) a supervisor took a tangible employment action against them; (2) a supervisor did not take any tangible employment action but CP cannot establish an affirmative defense; or (3) a non-supervisor took no tangible employment action, but CP knew or should have known of the harassment and failed to take remedial action. *See Johnson*, 234 F.3d at 509–10; *Breda v. Wolf Camera & Video*, 222 F.3d 886, 889 (11th Cir.2000).

CP raises three general objections to Plaintiffs' claims. First, CP asserts that certain Plaintiffs suffered no tangible employment actions. Second, CP argues that certain employees were not supervisors. Accordingly, CP claims that it had no notice of any alleged harassment. Third, CP invokes the *Faragher/Ellerth* affirmative defense. The response to these objections determines whether CP can be liable under either a strict liability, vicarious liability, or negligence standard. The court finds sufficient evidence for liability to attach under each theory.

### a. Strict liability

■ The court begins by discussing Plaintiffs' possibility of holding CP strictly liable for its actions. An employer is strictly liable if its supervisors take a tangible employment action on the basis of

forbidden criteria. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Llampallas v. Mini–Circuits Lab., Inc.*, 163 F.3d 1236, 1247 (11th Cir.1998). Assuming that the harms were caused by CP supervisors, the court finds evidence to show that each Plaintiff suffered a tangible employment decision.

The Eleventh Circuit defines a tangible employment action as "'an ultimate employment decision, such as discharge or failure to hire, or other conduct that alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." [15] *Johnson*, 234 F.3d at 512 (quoting *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000)); *see also Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) (defining tangible action as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing·a significant change in benefits.")

■ There is no question that the terminations of Ross, Dinkins, and Phillips constituted tangible employment actions. The same goes for Pruitt, who exchanged sex for lighter work and payroll padding. Submission to harassment as an implied condition for receiving a job benefit is a significant change in employment. *See Johnson v. Wal–Mart Stores, Inc.*, 987 F.Supp. 1376, 1391–92 (M.D.Ala.1997); *Durham v. Philippou*, 968 F.Supp. 648, 654 (M.D.Ala.1997) (collecting cases). Similarly, although it is a much closer call, Beasley and Young may also have suffered tangible employment actions.

Beasley and Young both allegedly faced "reassignment with significantly different

---

**15.** In a *quid pro quo* case, the question is whether "the employee's reaction to the unwelcome behavior affected tangible aspects of the employee's compensation, or terms, con-

ditions or privileges of employment." *Virgo v. Riviera Beach Assoc., Ltd.*, 30 F.3d 1350, 1361 (11th Cir.1994).

responsibilities." *Ellerth*, 524 U.S. at 761, 118 S.Ct. 2257. In this Circuit, a district court must "clearly explain" why it believes that a reasonable person in the plaintiff's position would have found the transfer to have been an adverse employment action. *See Johnson*, 234 F.3d at 513. The court does so below.

The court finds that Beasley and Young were repeatedly shuffled from one work station to another during a short time period. Beasley, for example, was moved from the salvage department to the liver table to a section where she washed down dead birds. Young, similarly, was transferred from the "leg debone" unit to the more difficult "breast debone" unit. Neither plaintiff received additional job training.

Beasley states that other employees were not treated similarly, that her supervisors "just stood behind her and watched her" in an intimidating manner and refused to let her use the restroom, and that Marsh continued harassing her when no one was around.

Young alleges that she was moved to a difficult position that is perceived as the plant's dumping ground. She also states that her supervisor said he was ordered to make these assignments, lest he be fired himself.

In response, CP argues that no employees received additional job training, that such moves were common, and that Plaintiffs suffered no change in work schedule or salary.

The parties have staked out positions on opposite ends of the spectrum. As Plaintiffs recognize, a significant change in employment can occur regardless of whether the individual retains the same salary and benefits. For example, actions that significantly increase an employee's work responsibility or block her opportunity for promotion or salary increases are improper. *See Reinhold v. Commonwealth*, 151 F.3d 172, 174 (4th Cir.1998). But on the other hand, as Defendant notes, a denial of job training or a change in the employment relationship, standing alone, is an intangible action. *See Watts v. Kroger Co.*, 170 F.3d 505, 510 (5th Cir.1999); *Flaherty v. Gas Research Institute*, 31 F.3d 451, 457 (7th Cir.1994). Thus, " 'a purely lateral transfer, that is, a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action.' " *Doe v. Dekalb County Sch. Dist.*, 145 F.3d 1441, 1448 (11th Cir.1998) (quoting *Williams v. Bristol–Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir.1996)).

Although the factual record is sparse, from the facts presented, the court finds that a reasonable person in Beasley or Young's position could agree that continued harassment and multiple transfers to lesser positions continues an adverse employment action, especially when other employees may not have been treated similarly. If so, CP will be strictly liable. *See Llampallas*, 163 F.3d at 1247.

### b. *Vicarious liability*

Of course, a jury may determine that Plaintiffs suffered no tangible employment action. Thus, the court's analysis cannot end without discussing two additional theories upon which liability may attach: (1) vicarious liability for harassment by supervisors that did not lead to a tangible employment decision; and (2) liability for the acts of co-workers about which CP had actual or constructive knowledge. In response to the former situation, CP raises the two-pronged *Faragher* affirmative defense. *See infra* Part IV.B. The court finds ample evidence for Plaintiffs to avoid summary judgment under either alternative.

### i. *Supervisor harassment without tangible employment actions*

■ Assuming that CP's supervisors created a hostile work environment but took no tangible employment actions, CP will be vicariously liable for the harm. *See Faragher*, 524 U.S. at 807, 118 S.Ct. 2275.

But this begs the question, "Who is a supervisor under Title VII?" As the par-

ties observe, the Eleventh Circuit has not given a direct answer.

Thus, the court reviews the matter with some detail and finds that a "supervisor" is one who has the actual authority to take tangible employment actions, or to recommend tangible employment actions if his or her recommendations are given substantial weight by the final decisionmaker, or to direct another employee's day-to-day work activities in a manner that may increase the employee's workload or triggers the assignment of additional or undesirable tasks.

### A. Definition of "supervisor"

■ A supervisor is considered an "agent" of the employer. *See* 42 U.S.C. § 2000e(b). The Eleventh Circuit has held that the term "agent" should be liberally construed to effect Title VII's remedial purpose. *See Urquiola v. Linen Supermarket, Inc.,* 1995 WL 266582 at *2 (M.D.Fla.1995) (citing *Williams v. City of Montgomery,* 742 F.2d 586, 588 (11th Cir. 1984)).

Under basic agency principles, an employer is liable for its agent's misconduct. *See Ellerth,* 524 U.S. at 763–64, 118 S.Ct. 2257. However, "common-law principles may not be transferable in all their particulars to Title VII." *See Meritor,* 477 U.S. at 72, 106 S.Ct. 2399. "The proper analysis here, then, calls not for a mechanical application of indefinite and malleable factors set forth in the Restatement … but rather an inquiry into the reasons that would support a conclusion that harassing behavior ought to be held within the scope of a supervisor's employment, and the reasons for the opposite view." *Faragher,* 524 U.S. at 797, 118 S.Ct. 2275.

"[T]he 'ultimate question' in determining the scope of employment is 'whether or not it is just that the loss resulting from the servant's acts should be considered as one of the normal risks to be borne by the business in which the servant is employed.'" *Id.* (quoting RESTATEMENT (SECOND) OF AGENCY § 229 cmt. a (1957)).

The Eleventh Circuit has held that a supervisor is acting as an agent for Title VII purposes when "'he [is] aided in accomplishing [the harassment] by the existence of the agency relationship.'" *Sparks v. Pilot Freight Carriers, Inc.,* 830 F.2d 1554, 1559 (11th Cir.1987) (quoting Restatement § 219(2)(d)); *see also Henson v. City of Dundee,* 682 F.2d 897, 910 (11th Cir.1982) ("when a supervisor makes employment decisions based on an employee's response to his sexual overtures, it is fair to hold the employer responsible because the supervisor is acting within at least the apparent scope of the authority entrusted to him by the employer.")

"[T]he employer 'is not insulated from liability by the fact that [its supervisor] was acting entirely for his own benefit.'" *Sims v. Montgomery County Comm'n,* 766 F.Supp. 1052, 1069 (M.D.Ala.1990) (quoting *Sparks,* 830 F.2d at 1558–59); *see also Karibian v. Columbia Univ.,* 14 F.3d 773, 780–81 (2d Cir.1994).

Title VII holds the employer liable for several reasons. The most obvious is that the supervisor imposes the corporation's coercive power upon the employee. Our society does not allocate resources from one's wealth to one's need. If the laborer does not work, she will not eat. Thus, by its very nature, a market regime involves submission and surrender by the laborer, and "'it is precisely because the supervisor is understood to be clothed with the employer's authority that he is able to impose unwelcome sexual conduct on subordinates.'" *Ellerth,* 524 U.S. at 763, 118 S.Ct. 2257 (quoting *Meritor,* 477 U.S. at 77, 106 S.Ct. 2399) (Marshall, J., concurring in judgment).

Naturally, Congress encourages work over welfare. Congress also recognizes that employees lack the bargaining power to affect significant workplace reform, and that the employer is the master of its domain. So Congress endowed the laborer with statutory rights and imposed upon employers a reasonable obligation to screen out supervisors who might violate those rights. But discrimination remains sadly foreseeable, and vicarious liability

comports with the rule that the principal—not the victim—should bear the avoidable costs of the agent's errors. *See Faragher*, 524 U.S. at 798, 118 S.Ct. 2275.

This discussion of Title VII's definition of "agent" is relevant because CP contends that Baxter, Burnett, Marsh, and other employees are not properly considered supervisors. CP basically urges the court to embrace the Seventh Circuit's definition of "supervisor."

In *Parkins v. Civil Constr., Inc.*, 163 F.3d 1027 (7th Cir.1998), the Seventh Circuit panel drew heavily upon its prior precedent in holding that "it is manifest that the essence of supervisory status is the authority to affect the terms and conditions of the victim's employment." The court added that:

> This authority primarily consists of the power to hire, fire, demote, promote, transfer, or discipline an employee. Absent an entrustment of at least some of this authority, an employee does not qualify as a supervisor for purposes of imputing liability to the employer.

*Id.* at 1034.

Although *Parkins* is appealing because it establishes simple rules for complex cases, the court believes that it improperly truncates the Supreme Court's holdings in *Faragher* and *Ellerth*. These companion cases clearly indicate that an analysis of employment relationships involves multifactorial analysis rather than simplistic taxonomy. *See Faragher*, 118 S.Ct. at 2288 (eschewing "mechanical application" of factors); *Ellerth*, 118 S.Ct. at 2268–69 (same).

In this Circuit, as Judge Thompson noted long ago, "[a] supervisor need not necessarily be high in the business structure, nor does he have to have the authority to hire, fire, or promote in order to be considered an agent whose conduct is binding on an employer." *Sims*, 766 F.Supp. at 1069; *see also Faragher v. City of Boca Raton*, 864 F.Supp. 1552, 1563–64 (S.D.Fla.1994), *aff'd*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Meritor*, 477 U.S. at 76, 106 S.Ct. 2399 (Marshall, J., concurring) ("A supervisor's responsibilities do not begin and end with the power to hire, fire, and discipline employees, or with the power to recommend such actions," but contemplate "the day-to-day supervision of the work environment and with ensuring a safe, productive workplace."); *Saville v. Houston County Healthcare Authority*, 852 F.Supp. 1512, 1527 (M.D.Ala.1994) (supervisors include those who watch over workers' assignments); *Grozdanich v. Leisure Hills Health Ctr., Inc.*, 25 F.Supp.2d 953, 973 (D.Minn.1998) (same). To the extent that the Seventh Circuit has held to the contrary, its rulings are neither binding nor persuasive.

The court finds that an employee is a supervisor or "agent" for purposes of Title VII if he has the actual authority to take tangible employment actions, *see Ellerth*, 524 U.S. at 762, 118 S.Ct. 2257, or to recommend tangible employment actions if his recommendations are given substantial weight by the final decisionmaker, *see id.*, or to direct another employee's day-to-day work activities in a manner that may increase the employee's workload or assign additional or undesirable tasks, *see Johnson*, 234 F.3d at 513.

However, our analysis is not done yet, because employer liability is not coterminous with the limits of actual authority. As the *Ellerth* Court stated, 524 U.S. at 769, 118 S.Ct. 2257, some "unusual" situations may arise when the victim has "a false impression that the actor was a supervisor, when he in fact was not."

■ A harassing employee, endowed with limited actual authority to monitor co-employees, will sometimes fool his comrades for evil ends. Such misconduct is foreseeable, *see Faragher*, 524 U.S. at 798, 118 S.Ct. 2275, and liability will attach to the employer under the doctrine of apparent authority, provided that the victim reasonably believed that the harasser possessed supervisory powers. *See Ellerth*, 524 U.S. at 759, 118 S.Ct. 2257 (discussing apparent authority); *Vinson v. Taylor*, 753 F.2d 141, 150 (D.C.Cir.1985), *aff'd sub nom. Meritor Sav. Bank v. Vinson*, 477

U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) ("even the appearance" of the power to "direct employees in their work, to evaluate their performances and to recommend personnel actions carries attendant power to coerce, intimidate and harass."); *Llampallas,* 163 F.3d at 1247 (same); *Henson,* 682 F.2d at 910 (same). *But see Gary v. Long,* 59 F.3d 1391, 1397–98 (D.C.Cir.1995) (no liability because victims cannot reasonably believe that employee has authority to harass).

Determining whether an employee reasonably believed that the harasser was a supervisor means considering the totality of the circumstances. The focus is on the overall work environment, the structural rigidity of the workforce hierarchy, and the relationship among all employees, supervisors, and managers. *See Sims,* 766 F.Supp. at 1069.

Radical economic changes are blurring the distinction between labor and management. The concept of the "overseer," who has the apparent authority to supervise, is not as uncommon as in the past.[16] According to the National Labor Relations Board:

> Hierarchical, autocratic systems, where the thinking and control aspect of work is separate from the doing of work, are in some workplaces giving way to flattened management systems and the elimination of levels of middle management. Greater autonomy, responsibility, and accountability [is] being afforded to workers at all levels of the organization, with an expectation that rank-and-file employees will not only perform work but will also be responsible for improving work methods and procedures, solving problems on the job, making decisions about production and quality, and coordinating their work with that of others.

*Mississippi Power & Light Co.,* 328 NLRB 146, 1999 WL 551405 at \*10 (N.L.R.B.1999).

■ Courts, of course, must be mindful of *Ellerth*'s teaching that claims based on apparent authority are "unusual." *See Ellerth,* 524 U.S. at 759, 118 S.Ct. 2257. A deluge of lawsuits filed by plaintiffs and attorneys with "empty heads and pure hearts" would unduly burden businesses and do employees no favor, either. Thus, as a matter of law, a nearly conclusive presumption arises against such claims when the employer has clearly notified its employees, in good faith, of precisely who is and is not a supervisor. Moreover, claims may never arise when the agency relationship merely provides the harasser with proximity to the plaintiff. A true holding out of authority is required. *See Hirschfeld v. New Mexico Corrections Dep't,* 916 F.2d 572, 579 (10th Cir.1990).

■ In this case, Plaintiffs have proffered substantial evidence that Baxter, Burnett, Marsh, and others were either actual or apparent agents of the employer.[17] Plaintiffs all were among the latter half of the first wave of employees hired at the plant. The company's first priority was to train the hundreds of workers who had come on board. According to supervisor Morrow, things were incredibly busy: "[I]t was training, nothing but training ... and I didn't have time to ... watch the area and make sure the lines were running." Thus, Morrow and supervisor Smith often relied on Baxter and Marsh to train and monitor the employees.[18]

Baxter was designated "a line chief or a line leader," who floated from one area to the next, watching the workers while Morrow and others took breaks, and offering training "wherever she needed to go or [Morrow] needed her to go."[19] Marsh,

---

16. "The centralization and hierarchy of workplaces defined by the assembly line has given way to the flexible, team-oriented atmosphere of many of today's modern offices." ANDREI CHERNY, THE NEXT DEAL: THE FUTURE OF PUBLIC LIFE IN THE INFORMATION AGE 17 (2000).

17. The list of possible supervisors includes Baxter, Burnett, Cooper, Gatlin, Hall, Hilgartner, Long, Morrow, Smith, White and Wright. *See* Pl. Spec. Evid. Submiss. at 1–13.

18. Morrow's Dep. at 221.

19. *Id.* at 61–62.

too, was pulled from his position as the sole manager of the freezer/eviscerator and allowed to train workers, time them, observe their progress, and report their mistakes to Baxter.[20] Marsh and Baxter even signed employee timesheets and gave written warnings to employees who were not up to snuff.[21]

The shop itself was essentially a warehouse with an assembly line and ancillary workstations, not an office with partitions and compartments. Employees were not explicitly told the identity or duties of their supervisors. Moreover, unlike neophytes in the rank-and-file who never stepped away from their work station, Baxter, Marsh and others with seniority "floated" across station lines. In this work environment, it is only natural that employees viewed their senior counterparts as extensions of management, with the authority to act on behalf of the company. Thus, it is fair to hold the employer liable for their foreseeable misconduct.

EEOC states that "an individual who is temporarily authorized to direct another employee's daily work activities qualifies as his or her 'supervisor' during that time period." *EEOC Policy Guidance on Vicarious Employer Liability for Unlawful Harassment by Supervisors, EEOC Notice No. 915.002* (June 18, 1999), *available in* 1999 WL 33103140 at *4. This interpretation is persuasive. *See Meritor,* 477 U.S. at 65, 106 S.Ct. 2399.

Accordingly, it is a jury question whether CP is vicariously liable for misconduct committed during the time periods when any individual had actual or apparent authority over Plaintiffs. *See Llampallas,* 163 F.3d at 1247 ("apparent authority serves just as well to impute liability to the employer for the employee's action.")

**B.** Faragher/Ellerth *affirmative defense*

■ CP seeks to avoid liability by raising the affirmative defense that: (1) CP exercised reasonable care to prevent and correct promptly any sexual harassment;

and (2) Plaintiffs unreasonably failed to take advantage of any preventive or corrective opportunities provided by CP or to avoid harm by other means. *See Madray v. Publix Supermarkets, Inc.,* 208 F.3d 1290, 1297–1300 (11th Cir.2000). After weighing the evidence with a thumb on the side of the scale favoring summary judgment, *see Monley v. Q Int'l Courier,* 128 F.Supp.2d 1155, 2001 WL 62602 at *6 (N.D.Ill.2001), the court finds that CP has not satisfied its burden.

First, the court finds that CP failed to prevent and correct workplace harassment. Under this prong, the employer must exercise "reasonable care not only to promptly correct any sexual harassing behavior, but also to prevent such behavior from occurring." *Fall v. Indiana Univ. Bd. of Trustees,* 12 F.Supp.2d 870, 881 (N.D.Ind.1998); *see also Madray,* 208 F.3d at 1297–1301 (bifurcated analysis). Slow-witted plaintiffs cannot avoid summary judgment by grumbling that they did not personally comprehend the policy; rather, they must show that the policy was administered "in bad faith" or was "otherwise defective or dysfunctional." *Madray,* 208 F.3d at 1299; *see also Nuri v. PRC, Inc.,* 13 F.Supp.2d 1296, 1307 (M.D.Ala.1998).

Here, CP did not take reasonable care to prevent Plaintiffs' harm. Although CP had a written anti-harassment policy, it was not "comprehensive," "well-known to employees," or "vigorously enforced." *Cf. Farley v. American Cast Iron Pipe Co.,* 115 F.3d 1548, 1554 (11th Cir.1997). The policy went undistributed for months at a time, was explained only cursorily, and was poorly administered by supervisors who had no training and almost no concept of what constitutes sexual harassment.

As for the second prong, Defendant's arguments are moot because a jury could find that each Plaintiff repeatedly complained to her supervisor, and that CP nonetheless failed to even investigate. *See*

---

**20.** *Id.* at 221–24.

**21.** Hilgartner's Dep. at 251–52; Pl. Spec. Evid. Submiss. at 6–8, 13.

*Robinson v. Jacksonville Shipyards, Inc.,* 760 F.Supp. 1486, 1530 (M.D.Fla.1991). CP argues that it has met its burden by showing that certain plaintiffs complained to someone other than their direct supervisor. This argument fails, however, for the policy does not define the term "direct supervisor," and there is considerable confusion as to who fit this bill. Summary judgment is inappropriate.[22] *See Breda v. Wolf Camera & Video,* 222 F.3d 886, 890 (11th Cir.2000); *Coates v. Sundor Brands, Inc.,* 164 F.3d 1361, 1364–66 (11th Cir. 1999).

Moreover, the express terms of the policy impose an obligation upon "any person not a victim of such harassment who becomes aware of possible sexual or other harassment" to relay that knowledge to his or her immediate supervisor or personnel manager.[23] On the one hand, as a matter of law, this language does not charge CP with notice of latent harassment that is known among employees alone. But on the other hand, the language may charge CP with knowledge of an employee's complaints whenever a proper complaint is registered with any supervisor—even if that supervisor is not the employee's direct supervisor.

Every supervisor is an "agent" of the employer. *See* 42 U.S.C. § 2000e(b). As plant manager White stated, once a supervisor learns of a complaint, the supervisor must report it to the human resources unit immediately.[24] Thus, each supervisor may have either actual or apparent authority to receive and process complaints. *See Breda,* 222 F.3d at 889. *Cf. Madray,* 208 F.3d at 1302 (liability can attach if proper complaint is made to mid-level supervisor at firm with open door policy). Put another way, CP is charged with actual notice of information provided to supervisors who are expressly designated as an employee's

direct supervisor. But it does not necessarily follow that CP cannot have notice if that information is provided to some other supervisor instead. *See Coates,* 164 F.3d at 1364. "If the employer has structured its organization such that a given individual has the authority to accept notice of a harassment problem, then notice to that individual is sufficient to hold the employer liable." *Williamson v. City of Houston,* 148 F.3d 462, 467 (5th Cir.1998).

In any event, CP's plant was a seething cauldron of bigotry, misogyny and transferred self-hate. The supervisors were so immersed in this environment that they could be deemed to have constructive knowledge of it. For all these reasons, CP has not satisfied its *Faragher* burden. *See Splunge v. Shoney's, Inc.,* 97 F.3d 488, 490 (11th Cir.1996); *Huddleston v. Roger Dean Chevrolet, Inc.,* 845 F.2d 900, 904 (11th Cir.1988).

### ii. Vicarious liability for co-employee harassment

As noted above, a final basis for employer liability arises from co-worker harassment of which CP either knew or should have known. CP is liable if it failed to take remedial action. CP's knowledge is a question of fact. *See Martin v. Norfolk Southern Railway Co.,* 926 F.Supp. 1044, 1051–52 (N.D.Ala.1996).

### C. Race and Gender Discrimination

█ Plaintiffs also have brought claims of race and gender discrimination based on circumstantial evidence. Plaintiffs argue that blacks and women were assigned to more difficult positions and terminated based on forbidden criteria. (Resp. at 79–80.) CP's motion does not speak to gender discrimination, and so the court shall not consider the issue, either. In addition, the court finds that summary judgment is due

---

**22.** Furthermore, mid-level supervisors may have blocked Plaintiffs' attempts to contact higher-ranking supervisors. This fact also precludes summary judgment. *See Wilson v. Tulsa Jr. College,* 164 F.3d 534, 541 (10th Cir.1998) (complaint process deficient when official who could take complaint was inac-

cessible due to hours of duty and location in separate facility).

**23.** Def. Ex. KL–7 at 3.

**24.** *See* White's Dep. at 65–66.

to be denied on Plaintiffs' claims of race discrimination. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115–17 (11th Cir. 1993).

Under the familiar *McDonnell–Douglas* burden-shifting framework, Plaintiffs must first raise an inference of discrimination by establishing a prima facie case. This requires showing that Plaintiffs: (1) are members of a protected class; (2) were qualified for the job from which they were discharged; (3) suffered an adverse employment decision; and (4) were treated differently from someone outside their protected class. *See Edwards v. Wallace Community College*, 49 F.3d 1517, 1521 (11th Cir.1995); *Moore v. State*, 989 F.Supp. 1412, 1417–19 (M.D.Ala.1997). The burden then shifts to the employer to show a legitimate non-discriminatory reason, and summary judgment will be entered unless Plaintiffs squarely rebut the proffered reasons with substantial evidence of pretext. *See Chapman v. AI Transp.*, 229 F.3d 1012, 1024, 1025 n. 11 (11th Cir.2000) (en banc).

All Plaintiffs possibly suffered tangible employment actions. To show similarly-situatedness, they "must show that employees are treated differently for nearly identical conduct." *Anderson v. Twitchell–A Tyco Int'l Ltd.*, 76 F.Supp.2d 1279, 1286 (M.D.Ala.1999). Plaintiffs cannot meet their burden by pointing to nameless, faceless people and making sweeping allegations of disparate treatment. Thus, charges that "two white people" or "those white men" received better treatment raise no inference of discrimination.[25] *See id.* at 1287 n. 9.

However, Plaintiffs have proffered additional evidence that: (1) they were denied, and white employee Christine Perry was granted, transfer from the salvage line to easier positions; and (2) they were terminated, and white employee Donna Williams was not, after complaining about harassment. The court finds that Perry and Williams are proper comparators to prove, broadly, that race motivated Plaintiffs' terminations and, more narrowly, their non-transfer from the salvage line to positions with significantly different responsibilities.

After applying the relevant law, the court finds that summary judgment is due to be denied on this count. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 120 S.Ct. 2097, 2108–09, 147 L.Ed.2d 105 (2000). The court addresses Plaintiffs' claims of retaliation and various state law tortious conduct in a separate, unpublished opinion.

## V. CONCLUSION

The court has previously commented on how large corporations "all too often lose sight of their civic and moral obligations to the people who eat, sleep, work, breathe, and die in their community." *Bowden v. Wal–Mart Stores, Inc.*, 124 F.Supp.2d 1228, 1238 (M.D.Ala.2000) (DeMent, J.) To help counterbalance this regrettable tendency of capitalism, Congress enacted Title VII. The statute's purpose is to promote full employment by eradicating the vestiges of discrimination that result in immoral and irrational employment decisions.

Labor should be a joy; it is an extension of the self. It gives the laborer the chance to share in the common life of the nation and to freely develop his or her own intrinsic talents and skills.[26] Sadly, the plaintiffs in this case were held as economic prisoners, tricked into thinking that they were being placed on a pedestal that was, in reality, a cage. *See Frontiero v. Richardson*, 411 U.S. 677, 684, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973). They will have their day in court.

---

**25.** Beasley's Dep. at 66–67; Pruitt's Dep. at 91.

**26.** *See generally* MICHAEL J. SANDEL, DEMOCRACY'S DISCONTENT· AMERICA IN SEARCH OF A PUBLIC PHILOSOPHY (1996) (discussing free labor's centrality to conceptions of both the voluntarist and narrative self).

## VI. ORDER

It is CONSIDERED and ORDERED as follows:

(1) Defendant Charoen Pokphand's Motion For Summary Judgment (Doc. No. 30) be and the same is hereby DENIED on all federal claims addressed herein; and (2) Defendant Smith's Motion To Dismiss (Doc. No. 25) be and the same is hereby GRANTED.